742 So.2d 107 (1999)
Tommy Lee CROWSON, Plaintiff-Appellee,
v.
Jenny Madan CROWSON, Defendant-Appellant.
No. 32,314-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
*108 James A. Hobbs, West Monroe, Counsel for Defendant-Appellant.
Loomis & DeMent by Albert E. Loomis, III, Monroe, Counsel for Plaintiff-Appellee.
Before NORRIS, C.J., and GASKINS and PEATROSS, JJ.
NORRIS, Chief Judge.
Jenny Crowson (Jenny) appeals a custody decree awarding joint custody of Justin Lane to her and Tommy Crowson (Tommy), and designating Tommy as domiciliary parent.

Facts
Tommy and Jenny were married on August 8, 1993; Justin Lane was born on July 27, 1994. Tommy filed for divorce on March 26, 1996; with the parties' consent, the trial court implemented a joint custody plan whereby Justin would reside with Jenny and Tommy would get liberal visitation. On August 27, 1996, Tommy filed a rule to modify custody, and the December 16, 1996 judgment of divorce with an agreed to modification of the prior joint custody plan was reduced to a written judgment signed on February 18, 1997. The stipulated joint custody plan provided that each party have Justin 50% of the time.
On December 23, 1997, Tommy filed a motion and rule for change of custody seeking to be designated the domiciliary parent, alleging that a change of circumstances had occurred in that: (1) Jenny's new husband, Brandon Parker (Brandon), physically abused Justin; (2) Jenny was abdicating her responsibilities by placing Justin with her step-father and mother, Bill and Tina Gold; (3) the Golds were adverse moral influences because they used foul language in Justin's presence; (4) Justin stated he would like to "get a *109 girlfriend and sleep with her tomorrow night," an idea he acquired due to his mother's and Mrs. Gold's influence; (5) in many instances Justin was delivered to him sick; (6) Jenny refused to use a car seat; (7) Jenny almost never attended to Justin's personal hygiene; and (8) Justin was, at any rate, "gravitating" substantially in Tommy's direction. Jenny filed a reconventional demand admitting a change of circumstances as Justin was getting older and starting pre-kindergarten and she and Tommy lived 60 miles apart. She sought to be declared domiciliary parent.
A trial was conducted, at which joint custody was maintained but Tommy was designated as domiciliary parent and Jenny given visitation. Jenny appeals the judgment, arguing that the trial court erroneously admitted certain evidence, erroneously expanded the pleadings, and that naming Tommy as domiciliary parent was not in Justin's best interests.

Law
A trial court's determination of child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. Cleeton v. Cleeton, 383 So.2d 1231 (La.1979) (on rehearing ); Bordelon v. Bordelon, 390 So.2d 1325 (La.1980); Powell v. Powell, 28,911 (La.App.2d Cir.12/11/96), 684 So.2d 1084; Stephens v. Smith, 30,028 (La.App.2d Cir.12/10/97), 704 So.2d 943; Stewart v. Stewart, 30,161 (La.App.2d Cir.1/21/98), 705 So.2d 802, writ denied 98-0748 (La.5/1/98), 718 So.2d 418. The trial judge, having observed the witnesses, is in the best position to determine credibility. Bunch v. Bunch, 469 So.2d 1191 (La.App. 3rd Cir.1985); Broussard v. Broussard, 462 So.2d 1386 (La.App. 3rd Cir.1985). An appellate court should be reluctant to interfere with custody plans ordered by the trial court in the exercise of its discretion. Powell v. Powell, supra; Stewart v. Stewart, supra.
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731; Oglesby v. Oglesby, 25,974 (La. App.2d Cir.8/17/94), 641 So.2d 1027; Stewart v. Stewart, supra. In addition, the jurisprudence has made a distinction between the burden of proof needed to change a custody plan ordered pursuant to a considered decree and that needed to change a non-considered decree or stipulated judgment. Id.; Powell v. Powell, supra.
A considered decree is an award of permanent custody in which a trial court has received evidence of parental fitness. Id. When a considered decree has been made, the party seeking to change custody bears the heavy burden of proving that "the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or ... that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." Id.; Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); see also La. C.C. art. 131, comment (d).
When the parties agree to a custody plan without offering evidence as to parental fitness, the burden to modify the stipulated decree is lighter than that needed to modify a considered decree. Evans v. Lungrin, supra; Powell v. Powell, supra; Oglesby v. Oglesby, supra; Stewart v. Stewart, supra. In order to modify a stipulated plan of custody, the party seeking the modification must prove (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. Id.
In determining the best interest of the child, the court must consider all the relevant factors, including the moral fitness of the parents as it affects the child. *110 La. C.C. art. 134.[1] Each case must be determined on the basis of its particular facts and circumstances by weighing and balancing those factors favoring and opposing custody for the respective parents. Simmons v. Simmons, 26,414 (La.App.2d Cir.1/25/95), 649 So.2d 799. Under the jurisprudential reformation rule, when a parent reforms or abstains from any previous course of open indiscretion and immorality, a court may deem the prior misconduct abated and the evidence of the conduct not relevant in determining fitness for custody. Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (1971); Rogers v. Rogers, 577 So.2d 761 (La.App. 1st Cir.1991).[2]
Whether evidence is relevant or not is within the discretion of the trial court, and its ruling will not be disturbed on appeal in the absence of a clear abuse of his discretion. Smith v. Smith, 615 So.2d 926 (La.App. 1st Cir.), writ denied 617 So.2d 916 (1993); Gautreau v. Gautreau, 96-1548 (La.App. 3rd Cir.6/18/97), 697 So.2d 1339. Evidence of incidents prior to entry to the stipulated judgment may not be relevant to prove a change in circumstances but may nevertheless remain relevant on the issue of best interest of the child. Stewart v. Stewart, supra; Evans v. Lungrin, supra; Smith v. Smith, supra. The trial court should not exclude evidence in a custody modification proceeding if that evidence is relevant and material to an issue which the parties have not previously had a full and fair opportunity to litigate. Id.

Analysis
Because both parties concede that there was a material change in circumstances, i.e., Justin beginning pre-kindergarten and Jenny and Tommy living a considerable distance apart, we limit our discussion to Justin's best interest.
During the trial, Lynn Thomas, accepted by the court as an expert in the field of social work, and Tommy both testified that Justin called him an inappropriate name, which Justin said he had heard Nana call Bill Gold. Tommy and Ms. Thomas also testified that Justin talked of a desire to get a girlfriend so that he could sleep with her. Tommy attributed this comment to Jenny and her mother; Ms. Thomas did not specifically attribute it to anyone, though she did testify that Justin was concerned with where everyone slept and told her that he had slept in the same bed with a child of one of Jenny's boyfriends. Additionally, Tommy testified that Justin told him that Brandon hurts him at times. Tommy had pictures of bruising on Justin's back, which Justin told Tommy and Ms. Thomas had been the result of "two elephants pushing him on some rocks" while he, his mother, and Brandon were at the lake.
Carrie Hodge, a friend of Jenny's, and Tommy's parents testified that during the *111 marriage Tommy did most of the housework; Tommy cooked and cleaned while Jenny went to school and worked. Ms. Hodge also testified that Jenny never cooked and seemed proud of this fact. Notably, Ms. Hodge has not seen Jenny since her divorce from Tommy, but remains in contact with Tommy. Tina Gold testified that Tommy and Jenny shared equally in rearing and nurturing Justin. Tommy's roommate, Marvin Paxton, testified that Tommy and Justin have a good relationship. He stated that Tommy bathes Justin, brushes his teeth, plays with him, says his prayers with him, and is very attentive to Justin's needs. Mr. Paxton stated that Tommy's parents care for Justin while he is working, and that Justin and his paternal grandparents have a warm and affectionate relationship.
Ms. Thomas testified that she saw Justin on four different occasions for an hour each session. The first day he had a bruised finger and said that Brandon had made him run into a door. Ms. Thomas testified that Justin reported to her that Tommy cuts his fingernails, puts him to bed, rocks him, helps him say his prayers, and takes him to church, and that Jenny does not. Ms. Thomas also reported that Justin was really attached to Tommy. Ms. Thomas further testified that Justin did not specifically speak of Brandon in a loving way.
Marjorie Benson, who was accepted as a Licensed Professional Counselor with experience dealing with children in custody matters, testified that she saw Justin on seven occasions, the first time for one hour and thereafter for half hour sessions. Ms. Benson reported that Justin was quite angry in his session with her and refused to talk about the pictures of his bruises. She further testified that Justin had a lot of anger and a great deal of tension. Ms. Benson also testified that during the last few sessions Justin responded to questions in a way that indicated to her that he had been coached by someone, quite probably in Jenny's house.
Jenny testified that in her home, Brandon does the majority of the cooking, though she fixes Justin's plate for meals. Jenny testified that she helps Justin get dressed, plays with him, reads to him, bathes him, and brushes his teeth. Jenny admitted disciplining Justin with a switch on one occasion and Brandon testified that he has physically disciplined Justin once or twice with his hand, but never with a switch or belt. Dr. Baker, an expert psychologist who testified on Jenny's behalf, testified that Justin and Jenny have a good relationship and that during the sessions, Justin had some difficulty leaving his mother. He stated that Justin seems more insecure than other children his age, but attributed that in part to the custody battle. He further testified that Justin and Brandon seem to have a good relationship. Dr. Baker stated that Jenny tends to be inconsistent with disciplining Justin, that she will ask him to do something and then not follow through. He also stated that Justin said he enjoyed seeing his father and talked highly of him. According to Dr. Baker, Justin indicated that he has a real daddy and a step daddy, and that he talked of both of them in a similar manner.
Justin's only exposure to organized religion has been through Tommy. Tommy attends church with Justin and helps him say his prayers at night. Jenny testified that she attended church while married to Tommy, but since their separation and subsequent divorce, she no longer attends services.
The evidence shows that both parents use daycare and their own parents in caring for Justin. Tommy places Justin in daycare on the days which he works and an occasional extra day so that Justin can play with children his age; his parents help care for Justin in the interim between daycare and his time off. Jenny also places Justin in daycare while she and Brandon are at work and her parents are available to help in the interim. The trial judge noted that both sets of grandparents were excellent resources available to either *112 parent and expressed his hope that they would continue to be available and used in the future.
Additionally, testimony was admitted about relationships which Jenny had during her marriage to Tommy, and which both have had since their divorce. During the marriage, and prior to the divorce, Jenny was involved in extra-marital relationships with various men, two of whom were married. Testimony supports the conclusion that Justin was present in the trailer during part of the relationships, i.e., he was in his room and getting up periodically while Jenny was hugging and kissing either John Trahan or Cam Douglas. Jenny also testified that since her marriage to Brandon approximately five months before the trial, she has not been involved in any other inappropriate relationships. Testimony was also introduced to show that after the divorce, Tommy started dating John Trahan's ex-wife, and that Justin and the Trahans' daughter were present while they were on a date.
Addressing Justin's best interest, the trial court found that Tommy enjoyed a close nurturing relationship with Justin and provided the most, if not only, exposure to church and religion. The trial court then found that both Jenny and Tommy had been in inappropriate relationships, but that Jenny had done so repeatedly. He further stated that during her testimony, Jenny had been evasive. The trial court then held that the preponderance of the evidence favored Tommy and awarded primary custody of Justin to Tommy.
Jenny argues that the trial court should not have admitted facts of her relationships with other men during her marriage to Tommy and prior to her marriage to Brandon over the objections of counsel. She further argues that the trial court erred in allowing in evidence which went beyond Tommy's pleadings. Lastly, Jenny argues that it is not in Justin's best interest for Tommy to be designated domiciliary parent since he is not married while she has remarried and her home is stable and provides a father figure for Justin.
The trial court apparently considered Jenny's and Tommy's relationships in making its determination that designating Tommy as domiciliary parent was in Justin's best interest. In support of her argument that the trial court erred in admitting evidence of her prior inappropriate relationships, Jenny cites Duvalle v. Duvalle, 27,271 (La.App.2d Cir.8/23/95), 660 So.2d 152, Stewart v. Stewart, supra, Evans v. Lungrin, supra, Sparks v. Sparks, 94-1315 (La.App. 3rd Cir.2/1/95), 649 So.2d 1223, writ denied 95-0561 (La.4/28/95), 653 So.2d 590. These cases hold that such evidence should not be used to determine whether a material change of circumstances has occurred. However, a change of circumstances was stipulated at trial, and the trial court agreed. Additionally, Jenny urged for the first time at oral argument before this court that this evidence should not have been admitted pursuant to the reformation doctrine; however, the trial court clearly did not utilize the evidence of prior indiscretions to deprive Jenny of custody as joint custody was granted. Instead, the evidence was obviously admitted and relevant to determine Justin's best interest and which parent was best suited to be designated domiciliary parent. Moreover, the trial judge was not required to accept Jenny's claim of rehabilitation, but was entitled to look at the totality of the circumstances in pursuit of the child's best interest. See Bolding v. Bolding, 532 So.2d 1199 (La.App. 2d Cir. 1988). Notably, Civil Code article 134 requires a consideration of all factors relevant to determining the best interest of the child.
In sum, the record, when viewed most favorably to maintaining the judgment, indicates that during the marriage Tommy was the primary caretaker and the only source of Justin's religious education and after the divorce Tommy continued to be a primary caretaker and source of Justin's religious education and on this record, designating *113 Tommy as domiciliary parent was not an abuse of the trial court's discretion.

Conclusion
Based on the evidence, we affirm the trial court's determination that designating Tommy as domiciliary parent is in Justin's best interest. Court costs are assessed to Jenny Parker.
AFFIRMED.
NOTES
[1] La. C.C. art. 134 provides that the factors in determining the best interest of the child may include: (1) the love, affection, and other emotional ties between each party and the child; (2) the capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child; (3) the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs; (4) the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment; (5) the permanence, as a family unit, of the existing or proposed custodial home or homes; (6) the moral fitness of each party, insofar as it affects the welfare of the child; (7) the mental and physical health of each party; (8) the home, school, and community history of the child; (9) the reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference; (10) the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party; (11) the distance between the respective residences of the parties; and (12) the responsibility for the care and rearing of the child previously exercised by each party.
[2] The reformation issue was not presented to the trial court or briefed, but it was discussed by counsel at oral arguments.