743 So.2d 930 (1999)
Hope BRACY, Plaintiff-Appellee,
v.
Stanley BRACY, Defendant-Appellant.
No. 32,841-CA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1999.
Writ Denied December 17, 1999.
*931 Samuel Thomas, Charles D. Jones, Lake Providence, Counsel for Appellant.
Albert E. Loomis, III, Monroe, Counsel for Intervenor-Frank Bruscato, Sr.
Before BROWN, GASKINS and CARAWAY, JJ.
GASKINS, J.
This appeal involves a custody award of a four-year-old girl to her maternal grandfather instead of to her surviving parent, appellant Stanley Bracy. The appellant contends that no showing of "substantial harm" was made and the trial court consequently erred in awarding custody to a nonparent. We affirm the judgment of the trial court.

FACTS
The appellant and the child's late mother, Hope Bruscato Bracy, were married in Georgia in June 1994. Thereafter, they moved to Missouri where their daughter, Lydia Dawn Bracy, was born on April 6, 1995.
The couple and Lydia moved to Monroe, Louisiana, in March 1996. For three months, they lived in the home of Hope's father, Frank Eugene Bruscato, Sr. They then moved out and took up residence in their own apartment. In February 1997, the appellant and Hope separated. Hope and Lydia moved back in with Mr. Bruscato. For two months in the fall of 1997, the appellant had physical custody of the child; however, the child was later returned to her mother.[1]
*932 In October 1997, Hope filed for divorce. On the issue of Lydia's custody, she sought joint custody with herself as domiciliary parent, subject to reasonable visitation rights for the appellant. The appellant was served and filed an answer in proper person, in which he requested joint custody of the child with him being designated primary custodial parent. In early 1998, the appellant left Louisiana shortly after a warrant was issued for his arrest on theft charges. Subsequently, Hope was granted a divorce; joint custody of the child was awarded with the mother being designated primary custodial parent and the father being granted reasonable visitation rights. The minutes reveal that the appellant made no court appearance in connection with the divorce. Judgment was signed July 27, 1998.
On October 16, 1998, Hope was killed in an elevator accident at work. No one in the appellant's family knew how to contact him to inform him of her death. On October 23, 1998, Mr. Bruscato, the maternal grandfather, filed a petition and intervention for custody of Lydia. He alleged that the child had been residing with him and that the appellant had not visited or communicated with her for a substantial period of time. The petition also alleged that the appellant had failed to financially support the child for extended periods of time and that he had a history of drug-related arrests and alcohol abuse. A temporary restraining order was granted prohibiting the appellant from removing the child from the grandfather's home. Also, on or about October 23, 1998, the appellant finally learned of Hope's death; his mother had to send him bus fare so he could return to Louisiana.
In his answer, the appellant alleged that the child had resided with him from October 1997 to January 1998. He further asserted that his former wife had allowed his mother, Ida Mae Bracy, to care for the child daily while she was at work for the eight-month period preceding Hope's death. He also alleged that the grandfather was a widower and that his adult daughter was a paranoid schizophrenic who lived with him and could not help care for the child.
Trial was held on November 13, 1998, and February 19, 1999. On March 31, 1999, the trial court issued extensive written reasons for judgment. It awarded sole custody of the child to her maternal grandfather. The court found that the appellant was a drug addict who was in denial about his use of crack cocaine. The court specifically found that the grandfather had proven by clear and convincing evidence that substantial harm would be caused to the child if her custody was awarded to her father.
In reaching its decision, the trial court relied, in part, on the testimony of Lynn Thomas, a board certified social worker, who interviewed Lydia on eight occasions. The child reported to her significant conflict, both verbal and physical, at the home of her paternal grandmother with whom the appellant resided. Also, the child was not strongly attached to her father. Furthermore, the trial court found the living arrangements offered by the appellant to be severely lacking. Specifically, his sister and her three children also lived with the appellant's mother in a four-bedroom house. Other family members, including the appellant's drug-addicted brother, periodically resided in that house. As a consequence, when Lydia spent the night at that house, she had to sleep with her grandmother.
Evidence was produced from several witnesses about the appellant's drug addiction. Although none of the witnesses personally observed the appellant using drugs, they testified as to statements by *933 the appellant admitting use of crack cocaine. In particular, the trial court was impressed with the testimony of the appellant's former landlady. She testified that she observed behavior demonstrative of cocaine addiction and that she had had several discussions with him about his addiction. However, during his testimony, the defendant adamantly denied any drug use or possessioneven when confronted with his criminal record, which included an arrest for marijuana possession and a resulting guilty plea to attempted marijuana possession.
The appellant was shown to have several convictions for forgery and issuing worthless checks. (There was evidence that when he moved to Georgia in early 1998, the police were seeking him on a theft charge.) His driving infractions have resulted in revocation of his driver's license. Although employed at the time of trial, the appellant's employment history was unstable, and he was demonstrated to have an extensive background of financial irresponsibility.
In contrast, the trial court found that the maternal grandfather, a widowed pharmacist, had been providing Lydia a secure and stable home in the four-bedroom, two-bath house he shared with his 25-year-old daughter, Christian. Although Christian testified that she had an affective disorder, the testimony showed that it was controlled with medication and that she had taken care of Lydia by herself on occasion.
The appellant appealed.

LAW
In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be deprived of such right only for compelling reasons. Tennessee v. Campbell, 28,823 (La.App.2d Cir.10/30/96), 682 So.2d 1274.
La. C.C. Art. 133 governs custody awards to nonparents. It provides:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child, and that the best interest of the child requires an award of custody to the nonparent. Tennessee v. Campbell, supra.
However, after an initial considered decree, the parent's paramount right to custody must be weighed in conjunction with the principles of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), i.e., the concern for terminating repeated litigation and continuing a child in an established living environment. Sheppard v. Hood, 605 So.2d 708 (La.App. 2d Cir.1992); Tennessee v. Campbell, supra. A considered decree is an award of permanent custody in which a trial court has received evidence of parental fitness. Crowson v. Crowson, 32,314 (La.App.2d Cir.9/22/99), 742 So.2d 107.
In a subsequent hearing by a parent against a nonparent to modify a "non-considered" custody decree, the nonparent bears the burden of proof and must show an award of custody to the parent would result in substantial harm to the child. Tennessee v. Campbell, supra.
Evidence of incidents prior to entry of a stipulated judgment may not be relevant to prove a change of circumstances but may nevertheless remain relevant on the issue of best interest of the child. Crowson v. Crowson, supra. The trial court should not exclude evidence in a custody modification proceeding if that evidence is relevant and material to an issue which the parties have not previously had *934 a full and fair opportunity to litigate. Crowson v. Crowson, supra.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even though the appellate court may feel that its own evaluations and inferences are as reasonable as those of the lower court. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact's findings. Only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in that which is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).

DISCUSSION
The appellant claims that the trial court erred by basing its ruling on "stereotypes and profiled evidence of drug use." He specifically contends that the trial court should not have considered evidence of his alleged drug use which predated the joint custody award in the divorce suit. He also complains of the trial court's consideration of his brother's drug addiction. He attacked the testimony of his former landlady as prejudiced on the basis that she had filed criminal charges against him for theft of an antique table. He also claims that the child's maternal aunt who resides with the grandfather is under the care of a psychiatrist and is not able to help care for the child. He maintains that his mother has been a primary caregiver of the child. On the other hand, the maternal grandfather requests that the trial court opinion be affirmed.
We note at the outset that the custody decree between the appellant and the child's late mother was not a considered decree as no evidence of parental fitness was apparently offered. Although joint custody was awarded, the mother was named domiciliary parent and the appellant, who had fled from Louisiana to Georgia in the wake of law enforcement entanglements, was given unspecified "reasonable visitation."
Most importantly, the present conflict is an initial custody contest between the appellant and the father of the deceased mother. Thus, according to La. C.C. art. 133, the maternal grandfather was required to prove that granting custody to the appellant would cause substantial harm to the child and that it was in the child's best interest for her custody to be awarded to the grandfather. Evidence of the appellant's conduct which predated the decree of custody in the mother's divorce suitincluding evidence of drug usage was highly relevant to making these determinations. The trial court found that Mr. Bruscato carried his burden of proof. After a careful and extensive review of the evidence, we agree.

Drug usage
Mr. Bruscato presented compelling evidence of the appellant's drug addiction and the turmoil it inflicted upon the appellant's immediate family. The most direct testimony came from the landlady of the apartments where the appellant lived after his separation from Hope. She described periods of time when the appellant would lock himself in his apartment after receiving his paycheck and go on drug binges lasting several days. (This conduct continued even during the period when he had physical custody of his very young daughter. While he would arrange for the child to be either in the care of his mother or the landlady during these periods, if she was in the landlady's care, he would reclaim the child at night.) As a result of his drug use, he would have no money to pay for food or rent. On occasion, the landlady generously bought food for him, and she frequently chauffeured him because he had no driver's license. Despite the appellant's claim that the landlady *935 was biased against him, her testimony reveals that she was sympathetic to his plight, and she readily declared her belief that he loved his child. She recounted conversations with the appellant in which he admitted his addiction to her and she urged him to seek help for the sake of his child.
The landlady's testimony that the appellant was a drug addict was corroborated by a variety of facts, including his lengthy history of job instability. During the time he lived in the landlady's apartments, he lost his job due to tardiness and nonappearance; in fact, he was fired from two of the three jobs he held in 1997. Due to his inability to pay rent, he was evicted from two different apartments in 1997. In 15 years, he had 13 different jobs, and there were some periods of unemployment. While he and Hope were separated, he hounded her relentlessly to obtain her paychecks, leaving her and Lydia all but destitute. He forced her to trade him her car in exchange for their daughter; at trial, he was unable to even recall what had become of the car after he obtained it.
During the time the appellant and his family lived in Missouri, Hope's relatives received pleas from her for money for food and to bail the appellant out of jail. When Hope's sister visited them after Lydia's birth, she observed the impoverished conditions in which the family was living and asked Mr. Bruscato to send Hope money. She also noted the appellant's frequent disappearances.
Yet the appellant testified that he always adequately supported his family. He referred to the instances when Hope's co-workers sent them groceries as invasions of their "privacy." He denied that Hope's co-workers donated clothes for the child and claimed to be unaware that they had given gifts to Lydia so she could have Christmas presents.
The appellant testified that he had been gainfully employed while living in Georgia and since his return to Monroe in October 1998. He lived with his mother but contributed only $50 per week to the household, and he made no financial contributions to Lydia's support. He owned no other property and had no bank account. Despite his claims of stable employment, when he testified at the custody trial in February 1999 he had only an accumulated worth of $321. He provided no explanation for this complete lack of finances.
At trial, the appellant was impeached with his deposition statement that he had never even been charged with any drug offenses. When confronted with his 1997 conviction for attempted possession of marijuana, he initially refused to concede it. In the deposition he had further stated that his only legal trouble consisted of two tickets for operating a vehicle without a license and the pending theft charge. The evidence at trial showed that, in fact, he had a myriad of convictions including shoplifting, several forgery convictions, and numerous traffic violations.
In his testimony, the appellant attempted to characterize his relationship with his daughter's mother as loving, supportive and communicative. He maintained that even when he was in Georgia, he stayed in close telephone contact with her and their child. The testimony of Hope's relatives and co-workers portrayed a different scenario. They described Hope as being fearful of the appellant. He called her at work repeatedly, usually to harass her into giving him her paycheck. According to their testimony, the appellant's constant demands for money left Hope lacking funds even for food.
The totality of the evidence strongly supports the trial court's finding that the appellant was a drug addict. The evidence further demonstrates that he was deeply in denial about his addiction, the havoc it had wreaked on his family, and the substantial harm it posed to his young daughter's well-being. In the trial court's view, his refusal to admit his addiction, much less seek treatment, rendered him unfit to have custody of his daughter. Based upon *936 the record before us, we are unable to find manifest error in the trial court's conclusion.

Brother's drug addiction
The appellant also contends that the trial court erred in considering his brother's drug addiction and holding it against him. The evidence demonstrates that the appellant's brother was a crack cocaine addict who had been in jail and that he periodically lived at their mother's house. The appellant denied knowing that his brother was an addict, even though his own mother testified that she and at least one of his sisters were aware of the problem. The fact that the brother was known to his own family as an addict and was allowed into the home where the appellant proposed to live with his daughter, if given custody, was a highly relevant factor pertaining to the child's safety. The trial court properly considered it in making its custody award.

Home environment
In a related argument, the appellant contends that the trial court should have given greater weight to the fact that his motherin whose home they would have resided and who would have assisted him if he had been awarded custodyhad been a primary caregiver of the child. However, the trial court found that the grandmother's "chaotic" household was not conducive to the child's well-being. The evidence found credible by the trial court demonstrated that the Bracy home was overcrowded and that it was the scene of physical and verbal abuse. According to the social worker who interviewed Lydia, the child had seen the appellant physically hit his elderly mother and he had also struck the young child herself across the face. Both the appellant and his mother denied the abuse claims, with the appellant denouncing the social workerand all of the other witnesses against himas a liar. However, the trial court made a reasonable credibility determination in favor of the social worker.

Maternal aunt's condition
The appellant argues that his former sister-in-law's mental condition was a factor which should have weighed against the trial court awarding custody to Mr. Bruscato because she lived in his house with him and Lydia. However, the evidence showed that Christian Bruscato's condition was adequately regulated with medication, that she was only seeing her psychiatrist once every six months, and that she was able to assist with Lydia's care when necessary. Contrary to the appellant's insinuations at trial, there was no evidence that she posed any sort of threat to the child's safety.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Stanley Bracy.
AFFIRMED.
NOTES
[1] There is dispute as to how the appellant obtained physical custody of the child. He testified that Hope voluntarily gave the child to him. Hope's relatives testified that he took the child from Mr. Bruscato's residence without Hope's consent. Mr. Bruscato testified that his daughter obtained her child's return only by acquiescing to the appellant's demands that she trade him her carand only transportationin exchange for the child. Although he denied this assertion, the appellant admitted that he got the car from Hope the day he returned the child to her and that he was threatened with trespassing charges for entering the Bruscato home.