JjHOSTELKA, J.
After the trial court awarded custody of two minor children to their maternal grandmother, the father appeals seeking custody of his daughter. Finding no error in the ruling below, we affirm.

Facts and Procedural History

Larry Henderson (“Larry”) and Veronica Brown (“Veronica”) were married in 1989. At that time, Veronica already had a young son, ATB. Subsequently, in 1990, Larry and Veronica had a daughter together, MAH. The marital problems that began as minor conflicts soon escalated to the point that Larry and Veronica’s fights often turned to violence. Eventually, the couple decided to separate. On the day Larry was packing to leave the home, April 14, 1996, a fight between the spouses erupted into gunfire. Larry fatally shot Veronica in the chest with a shotgun. Although not witnesses to the confrontation, *1183 the children were present in the home when their mother was Wiled. Initially, Larry was charged with second degree murder, but the charge was reduced to manslaughter. Larry pled guilty to negligent homicide and received a sentence of five years at hard labor.
Immediately after Larry’s arrest, ATB and MAH began residing with their maternal grandmother, Margaret Claville (“Margaret”), and her husband, Wilford Claville (“Wilford”). In July 1996, and again in March 1997, Larry’s mother, Bobby Henderson (“Bobby”), attempted to gain custody of the children. In a May 1998 judgment, Margaret was awarded custody of both ATB and MAH; Bobby was awarded specific visitation with MAH.[1]
Then, in December 1998, two months following his release from prison, Larry filed a rule to show cause seeWng custody of both his daughter, MAH, and his stepson, ATB. In that Larry had not been a party to the earlier custody | ¡.proceedings, the trial court treated this matter as an initial custody dispute.[2] And, after hearing several days of evidence, the court awarded custody of both children to Margaret and granted Larry visitation with MAH. The court further ordered Larry to pay Margaret $135 per month as child support for MAH. Apparently conceding the issue of custody as to ATB,[3] Larry appeals solely regarding the custody of his daughter.

Discussion

In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be deprived of such right only for compelling reasons. Bracy v. Bracy, 32,-841 (La.App.2d Cir.10/27/99), 743 So.2d 930, writ denied, 99-3325 (La. 12/17/99), 752 So.2d 169; Tennessee v. Campbell, 28,-823 (La.App.2d Cir.10/30/96), 682 So.2d 1274. Custody awards to nonparents are governed by La. C.C. art. 133, which provides:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child (i.e., would result in substantial harm), and that the best interest of the child requires an award of custody to the nonparent. Bracy, supra; Tennessee, supra.
IsBased upon the evidence presented at trial, it appears that both Larry and Margaret are capable and willing to care for MAH’s physical needs. Larry has obtained a home across the street from his own mother, Bobby. He earns an adequate salary working for Bobby’s daycare facility as well as doing odd jobs for church members. Likewise, Margaret and Wilford have retirement income as well as salaries from their own daycare center. They have a large home in which they care for not only ATB and MAH but also sever *1184 al other young relatives. Thus, the relevant inquiry becomes whether MAH would suffer substantial harm to her emotional well-being living in the care of Larry.
At trial, Larry presented a host of witnesses, ranging from deputy sheriffs who knew him while he was imprisoned to the pastors of his current church, along with family members, to demonstrate that he was a good father who could provide a good home for his children. Conversely, Margaret presented copious evidence about Larry’s propensity to violence during domestic disputes — particularly the shooting incident which led to Veronica’s death. Indeed, on appeal, Margaret argues that the witnesses who testified Larry was a nonviolent man with an even temper were either less than candid or woefully uninformed. While no one reported instances of physical abuse by Larry against MAH, there were descriptions of physical encounters between Larry and ATB. Larry admitted that he disciplined ATB by whipping him with either his hand or belt and further explained that he believed there was a difference between a whipping and a beating. Larry claims he never beat ATB.
Specifically regarding MAH, the evidence clearly indicated that she had thrived in the care of Margaret and Wilford, living alongside her half-brother, ATB. She had performed well in elementary school and was engaging in various church activities as well as taking piano lessons. Indeed, the other young girls in Margaret’s home looked up to MAH as a role model. When questioned by the trial __yudge, MAH named ATB as both her best friend and closest relative. Indeed, Dr. Richard Meece, a psychologist who evaluated the children and various involved adults, testified regarding the extremely close relationship between ATB and MAH. According to Dr. Meece, MAH’s “sun rises and sets around her big brother.” He describes ATB as MAH’s “security blanket.” Indeed, in MAH’s young but tumultuous life, the one point of constancy has been her relationship with ATB.
Dr. Meece believed that if MAH were placed with Larry, and thus separated from ATB, she would develop an adjustment disorder manifested by somatoform ailments, i.e., she would begin experiencing pain or other physical symptoms of illness with no underlying medical cause. Indeed, as alleged by Margaret and as confirmed by MAH’s teacher, MAH began experiencing headaches and stomachaches both at school and at home beginning when Larry was released from prison and she began making regular visits with him. Likewise, MAH’s school performance also began to fluctuate at that time.
Upon receiving this evidence, the trial court determined that MAH would suffer substantial harm if placed in Larry’s custody. As a reviewing court, we may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even though the appellate court may feel that its own evaluations and inferences are as reasonable as those of the lower court. When findings of fact are based on determinations regarding . the credibility of witnesses, the manifest error standard demands great deference to the trier of fact’s findings. Only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
| sUnder this unique set of circumstances, we agree with the trial court that placing MAH with her father would cause her substantial harm. Any advantages to be gained by permanent placement with Larry are clearly outweighed by the disadvantages of separating MAH and ATB and removing MAH from the stable environment which she so clearly needs. Separation of siblings is a hard choice and is not frequently approved. McKinley v. McKinley, 25,365 (La.App.2d Cir.01/19/94), *1185 631 So.2d 45. Moreover, MAH’s best interests are clearly served by continued placement in the home of Margaret and Wilford Claville.

Conclusion

Accordingly, for the foregoing reasons, the judgment below is affirmed at the cost of Larry Henderson.
AFFIRMED.

. Further, Margaret was named tutrix of both ATB and MAH. Wilford and Bobby were named co-undertutors of MAH, while Vanita Sumlin, ATB’s paternal grandmother, was named as ATB's undertutrix. The court had set forth essentially similar provisions in a July 1996 interim order prior to Larry's conviction.

. Cf. Kroics v. Kroics, 97-911 (La.App. 3d Cir.02/04/98), 705 So.2d 1302, in which the court concluded that where the nonparents previously had not been parties to the custody litigation, the stringent standard of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986) did not apply.

.The evidence at trial was quite clear that ATB did not wish to be placed in Larry’s custody. He conveyed a refusal to live with the man who killed his mother. Indeed, ATB had even declined to visit Larry in prison. Finally, ATB testified that, if the court ordered him to live with Larry, he would run away.