785 So.2d 69 (2001)
A.K. MILLS, Jr. and Virginia Mills, Plaintiffs-Appellants,
v.
Charles Lloyd WILKERSON, Defendant-Appellee.
No. 34,694-CA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 2001.
*70 Robert P. McLeod, Jr., Laurie Burkett, Monroe, Counsels for Plaintiffs-Appellants.
John Taylor Bentley, Bastrop, Dennis Grady Stewart, Rayville, Counsel for Defendant-Appellee.
Before NORRIS, STEWART and PEATROSS, JJ.
NORRIS, Chief Judge.
Maternal grandparents, Virginia and A.K. Mills ("the Mills"), appeal a judgment modifying a nonconsidered joint custody decree and awarding sole custody of Charles Ryan Wilkerson ("Ryan") to his father, Charles Wilkerson. Charles answers the appeal, challenging the trial court's grant of visitation rights to the Mills. We reverse and render.

Factual Background
Charles and Catherine ("Cathy") were married August 19, 1988; Ryan was born September 26, 1992. In May 1996, Cathy *71 and Charles separated; Cathy, Ryan and her two children from a previous marriage, Peter and Sarah, moved in with Cathy's parents, the Mills. Later that month, Cathy was killed in a train accident.[1] The children continued living with the Mills who, with permission from their biological father, soon adopted Peter and Sarah. Pursuant to a July 11, 1996 stipulated decree, the Mills and Charles agreed to share joint custody of Ryan on a 50/50 basis. Due to his work schedule, however, Charles rarely exercised custody and for the next three years, Ryan spent most of his time living with his grandparents and siblings. On August 24, 1998, Charles married Tammy, who has custody of Taylor, her daughter from a prior marriage and the same age as Ryan.
On June 25, 1999, Charles filed a petition to modify the joint custody plan, requesting sole custody of Ryan. The Mills filed a counter motion to modify the existing joint custody decree, seeking designation as domiciliary custodians. The court found that the Mills failed to show that sole custody with Charles would result in substantial harm to Ryan. A judgment was signed on August 17, 1999, granting Charles sole custody of Ryan effective May 26, 2000; in the interim, the Mills were to have temporary custody while Ryan would be integrated into Charles and Tammy's home. It also ordered that Ryan undergo therapy to prepare him for the move; further, "in order to receive this sole custody award," Charles was to pay for half of therapy costs, complete a substance abuse program including AA, and show documentation of continuing employment. From the bench, the court advised Charles, "if you had not been the parent, or if this had been a situation of nonparents versus nonparents, or parent versus parent, I would not be awarding you custody of this child." In light of these concerns, the judgment also provided that prior to May 26, 2000, the Mills or any other interested party could provoke a re-evaluation hearing if they felt that circumstances had changed such that actually transferring sole custody to Charles would result in substantial harm.
On May 3, 2000, the Mills filed for a re-evaluation hearing, alleging that the custody modification would cause Ryan substantial harm in that Charles had not attended the required AA meetings, maintained stable employment and residence, or timely paid for half of the therapy costs and expert witness fees; and that Ryan was in distress about moving in with Charles and Tammy. After receiving evidence, the court again found that the Mills failed to prove that granting Charles sole custody would cause substantial harm to Ryan. As before, the court enumerated grave concerns about placing Ryan with Charles,[2] even stating that if Charles had been on a "level playing field with Mr. and Mrs. *72 Mills," he would not be receiving custody. Nevertheless the court reaffirmed the sole custody decree of August 17, 1999 and made it executory.
The Mills appeal this judgment, contending that the wrong legal standard was used in determining Ryan's custody; under the correct standard, the party seeking modification should have to prove a material change in circumstances[3] and that the proposed change would serve the best interest of the child, rather than the substantial harm standard used by the trial court. Alternatively, they argue that the trial court erred in finding that transferring sole custody to Charles would not subject Ryan to substantial harm. They further argue that even if sole custody is proper, they should receive more liberal visitation, and they challenge the assessment of costs of the re-evaluation hearing. Charles answers, contesting the timeliness of the appeal and the award of visitation rights to the Mills.

Law and Analysis: Timeliness of Appeal
Charles argues that this appeal should be limited to the August 2000 judgment, as the August 1999 judgment was a final judgment which the Mills did not timely appeal.
The August 1999 judgment granted the Mills temporary custody of Ryan until May 26, 2000, at which time Charles would exercise sole custody of Ryan provided he met the conditions described above; if he failed to meet them, or if any interested party believed that the proposed change would result in substantial harm to the child, a re-evaluation hearing would be conducted. By its own terms the August 1999 judgment was an interim judgment subject to change until the issuance of the final judgment, signed August 2000. As such, the August 1999 judgment was not a final judgment under La. C.C.P. art. 1841, and only became final when the August 2000 judgment was signed and rendered. In sum, the Mills properly and timely appealed the entire case.

Admissibility of Evidence
The Mills argue that the trial court erred in excluding evidence of Charles' behavior prior to the stipulated decree. Evidence of incidents prior to entry of a stipulated judgment may not be relevant to prove a change of circumstances yet relevant on the issue of best interest of the child. Bracy v. Bracy, 32,841 (La.App. 2 Cir. 10/27/99), 743 So.2d 930, writ denied 99-3325 (La.12/17/99), 752 So.2d 169. We also find that such evidence, when introduced to show that the child will suffer substantial harm or his best interest will not be served if placed with a parent, is relevant. The trial court should not exclude evidence in a custody modification proceeding if that evidence is relevant and material to an issue which the parties have not previously had a full and fair opportunity to litigate. Id.
The trial judge heard evidence of Charles' drinking, DWIs, and financial irresponsibility; thus the evidence the Mills wanted in was introduced, though perhaps not to the extent they desired. The judge had the information before him and on review so does this court. Any error in not allowing additional evidence to support allegations is harmless under the circumstances. Morrison v. Kappa Alpha Psi Fraternity, 31,805 (La.App. 2 Cir. 5/7/99), 738 So.2d 1105, writs denied 99-1668, 99-1607, 99-1622 (La.9/24/99) 747 So.2d 1120, 749 So.2d 634, 635.

*73 Substantial Harm Analysis

The Mills contend that the trial court committed legal error by applying the wrong burden of proof to determine custody. Specifically, they argue that the district court erroneously applied a "substantial harm" rule propounded by this court in Tennessee v. Campbell, 28,823 (La.App. 2 Cir. 10/30/96), 682 So.2d 1274, rather than the "best interest of the child" rule. The Mills further argue that even if the substantial harm rule applied, the trial court was plainly wrong to find that placing Ryan in Charles' sole custody would not result in substantial harm to Ryan. Because we find merit in the Mills' second proposition, we decline to address the interesting legal issues raised by the first.[4]
The best interest of the child is the guiding principle in all child custody litigation. La. C.C. arts. 131, 134. Against a nonparent, the parent enjoys a paramount right to custody, and may be deprived of this right only for compelling reasons. Wood v. Beard, 290 So.2d 675 (La.1974); Martin v. Dupont, 32,490 (La. App. 2 Cir. 12/8/99), 748 So.2d 574. At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would result in substantial harm to the child, thus necessitating an award of custody to the nonparent. La. C.C. arts. 131, 133; Bracy v. Bracy, supra. In a subsequent hearing to modify a considered decree, the party seeking a change bears a heavy burden of proving that continuing the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986).
When the initial custody decree is by stipulation, default, or otherwise without the reception of evidence, it is deemed a nonconsidered decree. Oglesby v. Oglesby, 25,974 (La.App. 2 Cir. 8/17/94), 641 So.2d 1027. In a contest between parents to modify a prior nonconsidered decree of custody, the parent seeking a modification must prove a material change of circumstances and that any proposed change of custody is in the child's best interest. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731. When a nonparent is involved, the jurisprudence has been somewhat inconsistent; however, most recently this court has applied the rule that in an action to modify a prior nonconsidered decree between a parent and a nonparent, the nonparent must prove that awarding custody to the parent would result in substantial harm to the child. Tennessee v. Campbell, supra; Bracy v. Bracy, supra.[5] The concept of *74 substantial harm under art. 133 includes parental unfitness, neglect, abuse, abandonment of rights, and is broad enough to include "any other circumstances, such as prolonged separation of the child from its natural parents, that would cause the child to suffer substantial harm." Hughes v. McKenzie, 539 So.2d 965 (La.App. 2 Cir.), writ denied 542 So.2d 1388 (1989).
A trial court's assessment of the probative value of evidence is accorded great weight and will not be disturbed absent a clear abuse of discretion. Hargrove v. Hargrove, 29,590 (La.App. 2 Cir. 5/9/97), 694 So.2d 645, writ denied 97-1853 (La.10/31/97), 703 So.2d 24. For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record. Nichols v. Nichols, 32-219 (La.App. 2 Cir. 9/22/99), 747 So.2d 120.

Evidence at the 1999 Hearing
Ryan's mother died soon after she and her children moved into her parents' home; subsequently, the Mills adopted Ryan's two other siblings with the permission of their biological father and obtained joint custody of Ryan. They have raised the three children, providing for all their medical, educational, religious, and emotional needs. La. C.C. art. 134(5).
By stipulated decree the parties agreed to a 50/50 sharing of custody. Charles testified that he intended to exercise custody every other week, and even did so for a short period of time, but his work began to interfere. Charles did custom harvesting in the fall, electrical work in winter, and irrigation in spring and summer; depending on the time of year, he would often work six or seven days a week, ten or more hours a day, leaving him little time to be with Ryan. According to Charles, the Mills permitted him to visit Ryan whenever he had time off. Within a year, Charles opted to do only electrician work, but still worked long hours. After marrying Tammy in 1998, Charles moved to Starkville, Mississippi where he said he was working only five days a week, eight to ten hours a day. We share the trial court's reservations as to whether Charles is available for the child due to time constraints. La. C.C. art. 134(2).
There was considerable testimony regarding Charles' use of alcohol, which may have impaired his capacity and disposition to provide a stable home environment for Ryan. Before he and Cathy separated, Charles frequently drank and on occasion they would get into verbal confrontations. During one such incident, Charles put a stool through the wall. Charles admitted that he received two DWI convictions prior to the stipulated custody decree. After Cathy's death, he drank heavily. Mrs. Mills testified that on several occasions she smelled alcohol on Charles' breath, and once saw an open bottle of liquor on his counter. Charles acknowledged that there was alcohol present on that occasion, but stated that a lady friend was drinking the liquor, and he was only drinking beer; at the time Ryan was with one of Charles' sisters. Several witnesses also testified that Charles would drink when Ryan was in the car with him and on occasion would allow Ryan to sip his beer. La. C.C. art. 134(2), (3), (6).
Dr. Bobby Stephenson, an expert psychologist, evaluated Charles and opined that he tended toward dependency. In light of the overwhelming evidence that Charles drank frequently and to excess, the trial court ordered him to attend therapy and AA meetings.
*75 The Mills have provided for Ryan's financial needs since his mother died and have been saving at least half of Ryan's monthly social security benefits for his future. On their spacious farm Ryan has his own room and many things to occupy his time. Charles has serious financial problems; he owes several creditors, including child support arrearage to his first wife, who had put a lien on any award in his unsuccessful wrongful death suit. Additionally, Charles had written some worthless checks; he testified that most of these problems occurred because he did not get paid for work done and that all the charges were cleared up either by direct payment or credit for debts owed to him. La. C.C. art. 134(3).
Charles admittedly changed jobs and residences often. Prior to marrying Tammy, Charles moved with his employment, often living in motels and trailers. After marrying, he and Tammy lived in a house he owned in Rayville, then moved to an apartment in Starkville, Mississippi. La. C.C. art. 134(5).
Ryan's teachers and the Mills testified that Ryan has strongly expressed his desire to continue living with his grandparents. Charles conceded that before he filed for sole custody, Ryan lived with the Mills about 80-90% of the time. Ryan has a strong bond with his grandparents and with his siblings whom they have adopted. The Mills keep in regular contact with Ryan's teachers and have strong ties in the community. Additionally, Charles' immediate family is in the Rayville area. La. C.C. art. 134(8), (9).
Dr. Stephenson evaluated Ryan to assess the effects of living with Charles and Tammy. He found that this prospect, together with losing his grandparents, was a source of considerable anxiety for Ryan. He opined that Ryan had problems with trust, increased levels of emotional distress from the custody proceedings, and was showing a great deal of anger. Dr. Stephenson recommended that Ryan spend an extended amount of time with the Mills and unequivocally stated that it was in Ryan's best interest to continue living with them. La. C.C. art. 134(9).
At the close of this hearing the district court voiced grave concerns about Charles' fitness to exercise sole custody but stated it was bound by the "substantial harm" rule. Thus it awarded him sole custody, with the proviso that he adhere to the conditions listed above. Because Charles did not honor all of these and Ryan displayed increased distress over leaving their home, on May 3, 2000, the Mills filed for a re-evaluation hearing.

Re-evaluation Hearing
Tammy testified that since the August 1999 judgment, Charles has held four or five different jobs, some of which have required him to work seven days a week, 12 hours a day, and out of town, thus leaving Ryan primarily in her care. Tammy testified that she dropped out of school and due to Charles' employment opportunities, they moved to an apartment in Vicksburg. Charles continues to work long hours and is on call at all times. On one occasion Ryan was visiting his father, Tammy was out of town and Charles was called to work early Saturday morning; Charles carried Ryan to the jobsite and let him sleep in the truck until Charles' mother came to pick the child up. Ryan then spent the rest of the scheduled visit in Rayville with his paternal grandparents. La. C.C. art. 134(5).
Charles also failed to attend AA meetings as ordered by the court. Dr. Ann Hester, an expert licensed counselor retained by Charles, testified that she met with Charles and did an alcohol assessment on him. She concluded that Charles did not have an alcohol problem; based on *76 this belief, she advised him there was no need to attend AA meetings. She testified that aside from the alcohol assessment, she did not counsel him as to substance abuse, focusing rather on how to integrate blended families.
Tammy and Charles both testified that Charles still drinks regularly, though less often and now just beer. Based on Dr. Hester's testimony, the trial judge stated that he no longer believed that Charles was an alcoholic and revoked the earlier order requiring him to attend AA meetings. Despite this finding, the judge in oral reasons remarked that he was concerned about Charles' continued drinking and his failure to attend AA meetings despite the court order. Tammy testified that she questioned Charles about attending; Charles testified he called a number out of the phone book, but made no further efforts to attend area meetings.
Mrs. Mills testified that Tammy has displayed increased animosity towards her, provoking arguments about Ryan's clothes and avoiding Mrs. Mills. Tammy admitted that she felt animosity toward the Mills; she blames them for the disruption of her life caused by the custody suit. Both Mrs. Mills and Charles testified that the other should continue to be a part of Ryan's life, but Charles continues to show some animosity toward the Mills. The trial judge noted his concern about the increased acrimony between the parties. La. C.C. art. 134(10).
Soon after the August 1999 judgment, Charles contacted Social Security and changed the payee of Ryan's SSI benefits checks from the Mills to himself. The Mills requested these funds on Ryan's behalf and obtained an order requiring Charles to turn over these monies to them. Charles eventually complied, but not until the day of the re-evaluation hearing. Charles likewise eventually paid half the costs of therapy and the expert fees, but not in a timely manner. Additionally, Charles still has several creditors, including child support arrearage owed to his ex-wife. La. C.C. art. 134(3), (6).
Phyllis Taylor, an expert licensed practical counselor retained by both parties pursuant to court order, testified that since the August 1999 decree, she has had 22 sessions with Ryan to help facilitate his move to Charles' home and help him adjust to the change. She testified that Ryan does not want to live with his father, but wishes to stay with what he considers his family, the Mills and his siblings. Although she tried to talk about the fun things Ryan would do with his father, Ms. Taylor testified that Ryan would get angry or tearful. Ms. Taylor testified that although Ryan loves his father and does not want to anger him, he nevertheless wants to live with the Mills. She concluded that Ryan would be devastated to have to move in with his father and that it would be extremely traumatic for him. She further opined that the move would have a lasting negative emotional and psychological impact, especially since he would be suffering the loss of the Millsa second "parent," thus reactivating the feelings of loss and abandonment Ryan felt when his mother died. Ms. Taylor unequivocally concluded that granting sole custody of Ryan to Charles would cause Ryan substantial harm.
Mrs. Mills and Ms. Taylor both testified that Ryan asked them to tell the judge that he wanted to live with the Mills. According to them, Ryan did not believe he adequately expressed his desire to continue living with the Mills and he was concerned that he would get in trouble, or his father would become angry with him based on the outcome of the case. Ryan's apparent lack of concern when talking to the judge about moving to his father's home is *77 understandable due to his fear of retribution.[6]
Dr. Hester, on the other hand, felt that Charles was a fit father and it would be best if Ryan went to live with him as soon as possible. Notably, Dr. Hester based her opinion solely on information given to her only by Charles and Tammy; she never met or talked to Ryan or to the Mills.

Application of Standard to Present Case
Based on the entirety of this record, the trial court was plainly wrong to find that awarding Charles sole custody of Ryan would not result in substantial harm. This long record conclusively shows that modifying the prior decree and awarding domiciliary custody to Charles at the present time would cause substantial harm to Ryan. Specifically, altering custody would disturb the long, stable and nurturing relationship Ryan has enjoyed with the Mills. Moreover, Ryan was apprehensive about being forced to live with his father, continually expressing his desire to remain with the Mills. Ryan has undergone therapy for the sole purpose of facilitating the move, but despite all efforts to help him adjust, it is obvious that Ryan's serious concerns and fears have not been allayed. Ms. Taylor, who has done the most intense counseling with Ryan, was consistent in her conclusion that the actual move would cause a deep sense of loss and abandonment, with lasting emotional and psychological trauma. The contrary opinion of Dr. Hester does not refute this, as she never spoke to Ryan or to the Mills. See, Evans v. Lungrin, supra at p. 16, 708 So.2d at 740. Based on the evidence, Ryan would suffer substantial harm, lasting emotional and psychological trauma, if placed in Charles' sole custody. The district court was plainly wrong to find otherwise, and the judgment will be reversed and rendered accordingly.

Costs of Re-evaluation Hearing
The Mills argue that the trial court erred in assessing them the entire costs of the re-evaluation hearing, especially in light of the interim judgment, which divided the costs of the first hearing between them and Charles.
The party cast in judgment is generally taxed with costs, but the court may assess costs of a suit in any equitable manner. La. C.C.P. art.1920. Upon review, a trial court's assessment of costs can be reversed only upon a showing of an abuse of discretion. Grocery Supply Co. v. Winterton Food Stores, 31,114 (La.App.2d Cir.12/9/98), 722 So.2d 94; Rauch v. Rauch, 98,730 (La.App. 5th Cir.12/16/98), 725 So.2d 558. Because the Mills have ultimately prevailed, it would be abusive and inequitable to make them pay the costs of the re-evaluation hearing. Judgment will be reversed and rendered accordingly.

Answer
Charles answered the appeal alleging that the trial court erred in awarding the Mills any visitation. He cites Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), for the contention that grandparent visitation infringes on his constitutionally protected rights as a parent. Since we now award the Mills and Charles joint custody of Ryan, we do not need to address this issue. Furthermore, we decline to address this constitutional challenge *78 raised for the first time on appeal.[7] URCA Rule 2-12.4.

Conclusion
For the reasons expressed, we reverse the trial court's grant of sole custody of Ryan to Charles, reinstate the prior joint custody decree, and modify it to designate the Mills domiciliary custodians. We also reverse the assessment of costs of the reevaluation hearing, assessing these to Charles. Finally, we define Charles' custody periods. Judgment is rendered as follows:
It is ordered, adjudged, and decreed that A.K. Mills and Virginia Mills and Charles Wilkerson are granted joint custody of Ryan Wilkerson with Mr. and Mrs. Mills designated domiciliary parents. Charles is granted the following reasonable custody periods:
The first and third weekend of each month from September 1 to May 31 from 6:00 p.m. on Friday until 6:00 p.m. on Sunday.
Thanksgiving: Wednesday prior to Thanksgiving Day at 6:00 p.m. until the Sunday after Thanksgiving Day at 6:00 p.m. in even-number years.
Christmas: December 26 at 6:00 p.m. until December 30 at 6:00 p.m. in odd number years.
December 24 at 6:00 p.m. until December 28 at 6:00 p.m. in even number years.
Easter: Thursday prior to Good Friday at 6:00 p.m. until Easter Sunday at 6:00 p.m. in odd-number years.
Summer visitation: Last two weeks of June, all of July, and the first two weeks of August, with the Mills having physical custody the first and third weekend of July from 6:00 p.m. on Thursday until 6:00 p.m. on Sunday.
It is further ordered that the parties communicate on at least a monthly basis about Ryan's medical, physical, and emotional welfare and allow reasonable telephone calls from the other party to Ryan when he is in their physical custody.
It is further ordered that the Mills and Charles undertake the necessary steps for the Mills to be re-designated payees for Ryan's social security benefits and that the Mills deliver to Charles one-half of the month of June and August checks, and all of the month of July checks, upon receipt thereof.
It is further ordered that Charles pay the costs of the re-evaluation hearing, together with appellate costs.
REVERSED AS TO CUSTODY AND COSTS; JUDGMENT RENDERED.
NOTES
[1] Charles filed suit in his individual capacity and on Ryan's behalf against Kansas City Southern Railway. Charles and Ryan both received awards; which this court reversed, finding the accident was solely the driver's fault. Wilkerson v. Kansas City Southern Railway, 33,922 (La.App.2d Cir.11/1/00), 772 So.2d 268, writ denied, XXXX-XXXX (La.2/16/01), 786 So.2d 105.
[2] The court cited (1) the stress in the Wilkerson household over Taylor and Tammy's relationship with Ryan, finances, and other problems common to all blended families; (2) Charles' drinking and failure to attend substance abuse treatment; (3) Ryan's desire to live with the Mills and the conflicts spawned by these legal proceedings; (4) Charles' frequent changes of residence and employment; (5) Charles' work schedule, which has and may continue to limit his time with his family; (6) acrimony between the Mills and Charles; and (7) the loss Ryan would suffer from having to leave the Mills and his siblings.
[3] The Mills stipulated that neither party would have to show a material change in circumstances.
[4] The author of this opinion recognizes that the recent opinion in Evans v. Lungrin, 97-0541(La.2/6/98), 708 So.2d 731, may well support the Mills' contention. In Evans, the Supreme Court considered a motion to modify a custody decree that had been obtained by stipulated judgment between parents. The court found that the party seeking to change a stipulated decree must prove (1) a material change of circumstances since the entry of the original decree and (2) that the proposed modification is in the child's best interest. The court stressed, "the paramount consideration in any determination of child custody is the best interest of the child." The author feels that this statement enunciates a uniform standard applicable to all actions to modify nonconsidered decrees of custody. However, for the reasons assigned, the instant evidence mandates a finding of substantial harm.
[5] This court had previously held that the party seeking the modification must prove a change of circumstances and that the change in custody was in the best interest of the child. See, e.g., Hill v. Hill, 602 So.2d 287 (La.App. 2 Cir.1992); see also Robert v. Gaudet, 96 2506 (La.App. 1 Cir. 3/27/97), 691 So.2d 780, and Kleiser v. Kleiser, 619 So.2d 178 (La.App. 3 Cir.1993).
[6] The trial judge met with Ryan during both hearings. At the first hearing counsel was present and the judge assured Ryan that what he said in the judge's chambers would not be disclosed to either party. Nevertheless, Charles and Tammy confronted Ryan about things he said to the judge.
[7] Even had we addressed this issue, we would distinguish Troxel v. Granville, supra, in that the Washington statute, which was found to be overbroad, placed "no limits on either the person who may petition for visitation or the circumstances in which such a petition may be granted," while La. R.S. 9:344 narrowly allows grandparents to petition for visitation if their child (the parent of their grandchild) is dead, incarcerated or incapacitated. Notably, La. C.C. art. 136, the related visitation statute, has been found constitutional. See Reinhardt v. Reinhardt, 97-1889 (La.App. 1 Cir. 9/25/98), 720 So.2d 78, writ denied, 98-2697 (La.12/8/98), 734 So.2d 635, cert. denied, 526 U.S. 1114, 119 S.Ct. 1761, 143 L.Ed.2d 792 (1999).