999 So.2d 86 (2008)
Christopher Andrew Charles TEAGUE, Plaintiff-Appellee,
v.
Chantelle Rose Falardeau TEAGUE, Defendant-Appellant.
Chantelle R. Teague, Plaintiff-Appellant,
v.
Christopher "Andrew" Teague, Defendant-Appellee.
Nos. 44,005-CA, 44,006-CA.
Court of Appeal of Louisiana, Second Circuit.
November 25, 2008.
Rehearing Denied December 23, 2008.
*89 Laurie J. Burkett, for Appellant.
Fewell-Kitchens by Richard L. Fewell, Jr., Loomis & Dement by Jeffrey L. Dement, for Intervenor Appellees, Christopher V. Teague and Vicki LaDonna Teague.
Hamilton & Hamilton by John C. Hamilton, Oak Grove, for Appellee.
Before STEWART, GASKINS and MOORE, JJ.
STEWART, J.
This is an appeal by Chantelle Rose Falardeau Teague ("Chantelle") from a judgment awarding custody of her children to her former in-laws, Chris and Vicki LaDonna Teague ("Chris and LaDonna"). In addition to challenging the award of custody, Chantelle seeks review of the trial court's failure to rule on exceptions, its order setting time limits for testimony, its failure to award an abuse protection order and to prevent the habitual drug user and her former husband, Christopher Andrew Teague ("Andrew"), from having free and unsupervised access to the children, and its failure to specify visitation for Chantelle and to award support as prayed for in her petition. For the following reasons, we affirm the trial court's award of custody to Chris and LaDonna Teague but order that Andrew is not allowed to reside in their household with the children or have unsupervised access to them. We amend the judgment to provide Chantelle visitation as specified in an order attached to this opinion, and we grant the exceptions as explained herein.

FACTS
Chantelle, who is from Indiana, and Andrew, who is from Oak Grove, Louisiana, met in October 2004 while attending a United Church of God event in Panama City, Florida. Chantelle had traveled to Florida with several family members, including her daughter C.T., who was then 2 years old. From the start of their relationship, the couple smoked marijuana together. Andrew testified that he was happy to have found a woman who enjoyed the same things he did. At the end of the eight-day church event, Chantelle with her young daughter accompanied Andrew to Louisiana to meet his family. They then traveled to Indiana.
*90 While in Indiana, they expressed the desire to marry and met with Dr. Dixie Pederson, a clinical psychologist. Dr. Pederson had begun counseling Chantelle when she was involved in an abusive relationship with the man said to be C.T.'s biological father, Michael Tucker. Tucker had raped Chantelle approximately six months before she met Andrew. Dr. Pederson informed Andrew of the issues affecting Chantelle, who had been on medication for depression since a teenager and who was dealing with what Dr. Pederson described as post-traumatic stress from the rape.
Disregarding all advice to wait, Andrew and Chantelle eloped on October 21, 2004, just 19 days after first meeting. This rash decision resulted in a marriage notable for drug use, fights, and abuse. The newly married couple and C.T. settled in Oak Grove, living with Andrew's grandparents, Mildred and Charles Hayman. Andrew worked for his family's sweet potato farming business. Chantelle worked on the farm for a short time until she became pregnant. The couple lived with the Haymans for three to four months, then moved into a trailer on family property. The trailer had problems that made it uninhabitable, so the couple moved in with Andrew's parents, Chris and LaDonna. The couple's son, M.T., was born on July 20, 2005.
Another move occurred as a result of what is referred to in the record as the "pot weekend" in October 2005. On this infamous weekend Andrew, Chantelle, and her brother who was visiting Oak Grove camped out for the night to, as described by Andrew, "get off and kinda get tore up." That evening the group smoked marijuana, likely in the presence of C.T. When the Teagues found out the next morning, an argument took place. The Teagues disapproved of marijuana, but Andrew and Chantelle did not think it was a big deal. The couple packed their belongings and left with the two children. After attending a church event in Texas, they settled in an apartment in West Monroe where Andrew, who had obtained a commercial driver's license ("C.D.L."), continued to work for his family's farm as a truck driver. Chantelle described their time in West Monroe as the best part of their marriage.
The good times ended when Andrew got a D.U.I. and lost his C.D.L. The couple moved back to Oak Grove to live in a rent house owned by Andrew's maternal grandparents, the Mortons. Andrew continued working for the family farming business, while Chantelle took care of the children at home. While living in the rent house in Oak Grove, the couple's relationship deteriorated. It appears from the record that this period involved almost daily use of marijuana by both Andrew and Chantelle.
In November 2006, Chantelle went to Indiana with C.T. Andrew did not want to make the trip and would not allow her to take their son. Chantelle met with Dr. Pederson to discuss the problems in her marriage. These included the drug use and Andrew's unwillingness to quit, the isolated environment of Oak Grove where she allegedly lacked transportation and adequate health care, the involvement of Andrew's parents in their marriage and care of the children, Andrew's sexual demands, and his physically abusive behavior.
Chantelle testified that matters worsened upon her return to Andrew in Oak Grove. In March 2007, the couple traveled to Florida leaving the two children with the Teagues. The purpose of the trip was to visit Chantelle's brother who lived there and perhaps scope out job opportunities. Andrew still received a salary from his family's farm but he did not always show up for work. Andrew testified that they had been having "bad times" in the marriage *91 and that Chantelle was always moody. According to Chantelle, Andrew agreed during the trip to quit using marijuana.
They returned to Oak Grove in a good mood and in time for a visit from Chantelle's mother and stepfather, Michelle and Michael Grovak, for Easter weekend. Before attending church services on Saturday, Andrew and Chantelle got into an argument after M.T. spilled a powder on the carpet. Andrew testified that he put up with Chantelle's attitude at church and then left to go calm himself by drinking and smoking with friends. He did not return home that night. When Chantelle called him the next morning he told her that he no longer loved her and that she should take C.T. and return to Indiana with her parents. Chantelle packed things for herself and the two children and then left with her parents for Indiana on April 8, 2007.
Within days Andrew traveled to Indiana where he visited Chantelle and her family for C.T.'s birthday and attended counseling with Dr. Pederson apparently under the guise of wanting to save the marriage. Unbeknownst to Chantelle, Andrew was there only to abscond with the children which he succeeded in doing with the help of his father and his cousin T.J. O'Neal. After the counseling session with Dr. Pederson, Andrew went with Chantelle and the two children to a park where T.J. let the air out of a tire on Chantelle's vehicle to create a distraction. While she tried to inflate the tire, Andrew wandered off with the children and met his father who had allegedly rented a van for the trip back to Louisiana. Andrew called to tell Chantelle that he had the children, but he would not allow her to speak to them.
On April 18, 2007, Chantelle returned to Louisiana with her stepfather and filed a petition for an abuse protection order. She got a temporary restraining order against Andrew, use of the residence where the couple had been residing, and temporary custody of the children within the court's jurisdiction. Also on April 18, 2007, Andrew filed a petition for divorce seeking joint custody of the children with him as domiciliary parent. He evaded the order obtained by Chantelle and avoided turning over custody of the children by hiding out with them and his mother in Arkansas. Teague family members further thwarted the orders of the court by turning off the water to the house where Chantelle was to stay and serving an eviction notice.
On April 27, 2007, Chris and LaDonna intervened in Andrew's divorce proceeding to seek sole custody of C.T. and M.T. They alleged that Andrew and Chantelle regularly fought in front of the children and used marijuana, that neither was employed, and that Chantelle suffered from Borderline Personality Disorder ("B.P.D.") and rages. They made allegations of neglect and asked for psychological evaluations of the parties and hair follicle drug testing.
Chantelle filed a petition for divorce and request for sole custody with child and spousal support as well as an abuse protection order against Andrew on April 30, 2007. She also filed exceptions of no right of action and no cause of action alleging that Andrew was not C.T.'s biological father and had not sufficiently pled a cause of action for custody as a nonparent.
After a hearing on April 30, 2008, the trial court ordered the parties to have a hair follicle drug test and decreed an interim visitation schedule on an alternating two-week basis between Chantelle in Indiana and Andrew in Louisiana. Both parties were to be supervised by their respective parents.
*92 Trial began on August 3, 2007, at which time the trial court ordered that C.T. begin kindergarten in Louisiana. The trial court heard additional testimony on August 20, 21 and 24, October 17, and November 16, 2007. At the close of trial, the judge requested that each party prepare proposed written reasons for judgment. The trial court signed those prepared by counsel for the Teagues which concluded that being with either Andrew or Chantelle would result in substantial harm to the children and that their best interests would be served by placing them in the custody of Chris and LaDonna Teague with visitation rights granted to Chantelle but to be determined by the parties. Judgment was rendered April 22, 2008, and Chantelle's appeal followed. We note that a judgment of divorce was granted on June 5, 2008.

DISCUSSION
Chantelle raises 13 assignments of error for review. Three pertain to the exceptions filed by her concerning Andrew's request for custody of C.T.; two pertain to time limitations placed on the parties for examining and cross-examining witnesses; one pertains to the trial court's failure to award an abuse protection order; three pertain to the award of custody to the Teagues; two pertain to visitation; and the remaining two pertain to support issues.

Assignments 1-3:
The first three assignments of error concern Andrew's request for custody of C.T. Chantelle filed exceptions of no right of action and no cause of action asserting that Andrew is not the child's biological father and did not make allegations sufficient to state a cause of action for custody by a nonparent. The record does not show that the trial court ever ruled upon the exceptions.
In his petition for divorce, Andrew alleged that he had adopted C.T. This allegation was based on a "Paternity Affidavit Upon Marriage" obtained by Chantelle from Indiana for the purpose of having C.T.'s last name changed to Teague. The affidavit was signed by Andrew and Chantelle and notarized in West Carroll Parish on April 6, 2005. Chantelle urges that the exceptions should be granted to make clear that Andrew's burden of proof is that of a nonparent with regard to C.T. in this or any future custody dispute.
La. R.S. 9:393 requires Louisiana courts to give full faith and credit to "an affidavit acknowledging paternity executed in any state in accordance with the laws and procedures of that state." Under this directive, the affidavit would not be entitled to full faith and credit. It is a form provided by the State of Indiana for the purpose of establishing paternity under the laws of that state. The facts show that the affidavit was not executed in Indiana in accordance with the laws and procedures of that state. Rather, it was executed in Louisiana. Therefore, neither this court nor any Louisiana court is required to give the affidavit full faith and credit as a document establishing paternity of C.T. under the laws of Indiana.
Moreover, the affidavit does not comply with the laws of Louisiana for an acknowledgment of paternity. In Louisiana, paternity is presumed when there is an acknowledgment of the child by authentic act or by signing the birth certificate. La. C.C. art. 195 and art. 196. The affidavit, though notarized, is not an authentic act as it was not executed in the presence of two witnesses who are also required to sign the act. La. C.C. art. 1833. There is no evidence in the record that Andrew ever signed C.T.'s birth certificate. Even if Andrew had signed C.T.'s birth certificate, only a father may acknowledge an *93 illegitimate child by placing his name on the birth certificate. McKinley v. McKinley, 25,365 (La.App.2d Cir.1/19/94), 631 So.2d 45.
We find that the affidavit executed by Andrew and Chantelle does not suffice to establish paternity or a presumption of paternity on the part of Andrew as to C.T. The fact that Andrew is not C.T.'s biological father is not in dispute, and there is no evidence of an adoption. Accordingly, the trial court erred in not granting the exceptions filed by Chantelle. Andrew did not have a right of action to seek custody of C.T. as a parent, and he did not allege a cause of action for custody as a nonparent. As to C.T., Andrew's burden of proof for seeking custody in this or any future proceeding is the same as that of a nonparent. See McKinley v. McKinley, supra.

Assignments 4-5:
In these two assignments of error, Chantelle complains that she was prejudiced by the trial court's decision on the second day of trial to limit each attorney to five hours for their direct and cross-examination of witnesses. She also complains that the trial court should not have allowed Andrew to call witnesses once he testified that he was not seeking custody. She claims this allowed him to present testimony beneficial to his parents' cause thereby giving them additional time to present their case through him.
La. C.C.P. art. 1631(A) recognizes the court's power to require that proceedings be conducted with dignity and in an orderly and expeditious manner and to control trial proceedings so that justice is done. The trial court has great discretion in directing the manner in which proceedings are conducted, and only upon a showing of a gross abuse of that discretion will the appellate court intervene. Youngblood v. Lee, 40,314 (La.App.2d Cir.11/2/05), 914 So.2d 1186, writ denied, XXXX-XXXX (La.4/17/06), 926 So.2d 522.
A similar limitation was challenged in Goodwin v. Goodwin, 618 So.2d 579 (La. App. 2d Cir.1993), writ denied, 623 So.2d 1340 (La.1993), on due process grounds, and the complaint was found to lack merit. The court set forth nonexclusive guidelines for determining whether a time limitation should be imposed. Consideration should be given to whether the litigant has sufficient time to present all relevant, admissible, noncumulative evidence; whether the trial judge is familiar with the case so that he is able to set reasonable time limits; whether the time limits are imposed with sufficient notice, while recognizing that the trial court may impose reasonable limits after trial has begun if it appears necessary; whether the trial court provides reasonable extensions of time for good cause shown to ensure that due process is being afforded to the litigants; whether there is an equitable method for charging time against each litigant; and whether the rulings regarding the time limits and reasons for the rulings are on the record. Goodwin, 618 So.2d at 584.
The record shows that the time limit was imposed on the second day of trial, but the court noted that it had been discussed in a pretrial conference on August 3, 2007. Significantly, there was no objection on the record to the imposition of the time limit. Though Chantelle claims she was not given the opportunity to fully present all relevant evidence in her case, the record shows that her counsel thoroughly examined the witnesses presented on her behalf and cross-examined those called by the other parties. The only indication of the trial court limiting her time was during her cross of LaDonna, which spanned parts of two days and appears to have addressed all relevant issues. When the trial court noted that counsel had six minutes *94 left, no objection was made nor was additional time requested. Counsel for Chantelle was allowed to question LaDonna again on recross, she fully cross-examined Vicki Morton, who was the last witness called against Chantelle, and she was permitted to recall Chantelle as a rebuttal witness. Though Chantelle complains that she was not allowed to cross-examine Chris Teague, he was not called as a witness by any party.
This trial took place over six days, during which time Chantelle was allowed to fully present her case as evidenced by the efforts of her attorney in exhaustively questioning the witnesses who testified. We do not find an abuse of discretion by the trial court in imposing the time limitation. It does not appear from the record that the limitations were strictly enforced.
We also find no abuse of discretion by the trial court or prejudice to Chantelle's case from Andrew's presentation of evidence after he testified that he did not want custody due to his financial inability to care for the children. He is a party to the proceedings, and the evidence he presented is relevant to determining the best interests of the children. Also, there is no showing that the Teagues would not or could not have called the same witnesses on their behalf, namely his grandmother Mildred Hayman and his aunt Ginger Schmitz.

Assignment 6:
Chantelle argues that the trial court erred in failing to award her an abuse protection order pursuant to La. R.S. 46:2136 even though the evidence conclusively established that Andrew had physically abused her on more than one occasion during their short marriage.
Andrew admitted to various acts of physical abuse which included spanking Chantelle on the buttocks hard enough to cause a bruise, tackling her to the ground and squirting Desitin in her mouth, punching her on the arm, and shooting her leg with a "soft dart gun." He sought to excuse his behavior by blaming it on Chantelle's "rages," which he said involved violent cussing and outbursts. He claimed that during the rages Chantelle threw things, destroyed pictures, smashed his sunglasses, and ripped his hat.
We note that Chantelle began legal proceedings by filing a petition for protection from abuse and that she was granted a temporary restraining order on April 18, 2007. It appears from the record that the order was maintained through trial by the judgment of June 22, 2007.
Pursuant to La. R.S. 46:2136(A), the court may grant a protective order to bring about a cessation of abuse of a party or any minor children. At the time of trial, the temporary restraining order had been in effect for over six months. The incidents described above had occurred during the marriage, and there was no evidence of ongoing abusive behavior or harassment between the parties for which a protective order would be required to provide immediate protection. On this record, we find no abuse of discretion on the part of the trial court in failing to grant a protective order under La. R.S. 46:2136.

Assignments 7-9:
These assignments challenge the trial court's award of custody to the Teagues. Chantelle argues that the Teagues failed to meet the burden of proof required to divest a natural parent of custody in favor of a nonparent.
In custody disputes between a parent and a nonparent, the parent enjoys the paramount right to custody and may be deprived of such right only for compelling reasons. Street v. May, 35,589 (La.App.2d Cir.12/5/01), 803 So.2d 312; Mills v. Wilkerson, *95 34,694 (La.App.2d Cir.3/26/01), 785 So.2d 69.
If joint custody or sole custody to either parent would result in substantial harm to the child, the court may award custody to another person with whom the child has been living in a wholesome and stable environment or who is able to provide an adequate and stable environment for the child. La. C.C. art. 133.
Thus, in an initial custody dispute between a parent and a nonparent, the burden of proof is on the nonparent to show that substantial harm would result to the child if custody is awarded to the parent. Mills v. Wilkerson, supra. Substantial harm is a broad concept that encompasses parental unfitness, abuse, neglect, abandonment of rights, and any other circumstance, such as a prolonged separation from the natural parents, that would cause the child to suffer substantial harm. Id.
The guiding principle in any child custody dispute is the best interest of the child. La. C.C. art. 131; Street v. May, supra. Determining the best interest of the child is a fact-intensive inquiry that requires the court to weigh and balance the factors favoring and opposing an award of custody to the competing parties based on the evidence presented. Street v. May, supra; Warlick v. Warlick, 27,389 (La.App.2d Cir.9/29/95), 661 So.2d 706. The trial court is in the best position to ascertain the best interest of the child in light of each unique set of circumstances. Street v. May, supra. The trial court's findings of fact in custody disputes will not be set aside on appeal unless they are manifestly erroneous or clearly wrong. Id.
We have closely reviewed the arguments of the parties on appeal and the testimony and exhibits offered at trial. We will not recount the details of the extensive testimony regarding the marriage, the fights, the drug use, and the neglectful parenting. Chantelle and witnesses on her behalf testified that she is able to provide care as a loving mother for her two children. None of Chantelle's witnesses, all of whom were from Indiana and had little direct knowledge of her life in Louisiana, reported instances of neglect of the children or behavior by Chantelle that would be described as rages. On the other side, the family members who testified on behalf of Andrew and the Teagues painted a picture of Chantelle as a neglectful mother who did not properly tend to her children's needs. They testified about instances when C.T. was not dressed appropriately and when M.T. was left unattended in dirty diapers. They reported a number of occasions on which C.T. was seen alone outside some distance away from the home while Chantelle was inside with the doors locked and apparently sleeping. They also reported one instance where C.T. was found alone on the grounds of the hotel in Texas where Andrew and Chantelle stayed for a church event after the "pot weekend." Andrew claimed that Chantelle spent her days smoking marijuana, which she denied.
Chantelle testified that she did not know the extent of Andrew's drug use when they married, and Andrew testified that he was not made aware of the extent of her mental health issues prior to the marriage. Their complaints reflect their immaturity and poor judgment in marrying just 19 days after first meeting. It is obvious that Andrew and Chantelle each tried to minimize and excuse their own actions while emphasizing the bad behaviors of the other. However, the totality of the evidence suggests that both lack fitness as a parent.
Their rash marriage was volatile and unstable. The couple moved over four *96 times during their two and half years of marriage and mostly relied on Andrew's family to provide them with a place to live and income. They fought. Chantelle admitted to anger and acts such as throwing rocks at their vehicle and ripping Andrew's hat, but she denied having "rages" as described by Andrew. Andrew admitted to various acts of physical abuse during fights, but attributed his actions to his inability to deal with Chantelle's rages. He claimed that Chantelle never realized what she was doing when she was "raging."
Chantelle's mental health was another concern raised at trial. She admitted to having depression beginning during her teen years. Much was made of an incident when she was 17, at which time she threatened to take pills and locked herself in her room during an argument with her mother and stepfather about the use of the family car. She was hospitalized for a short time and diagnosed with oppositional defiant disorder. In September 2003, Chantelle began counseling with Dr. Dixie Pederson, a clinical psychologist, for issues stemming from an abusive relationship with Michael Tucker and later for the rape. Dr. Pederson testified that Chantelle suffered from depression and post-traumatic stress from the abuse and rape by Tucker. She did not believe that Chantelle met the diagnostic criteria for borderline personality disorder. There is no evidence in the record to establish that Chantelle was ever given a credible diagnosis of that particular mental health malady.
Of most significance to this custody determination is the drug use by Chantelle and Andrew. Both parties admitted to drug use during the marriage. Chantelle testified that she smoked marijuana and tried pain pills that Andrew took from his mother and grandmother or bought. During their first year of marriage, they left the home of Andrew's parents because of the "pot weekend." Chantelle testified that they typically smoked marijuana in the evening after the kids were put to bed and asleep. She also admitted that she smoked marijuana once or twice while pregnant with M.T. She said that she used marijuana to have something in common to do with Andrew. Her testimony indicates that she did not view marijuana as particularly harmful to the children or as something that might impair her ability as a parent. To her credit, Chantelle recognized that the drug use was not helping her marriage and she urged Andrew to quit and go into rehab. His testimony verifies this fact. Chantelle testified that she had not smoked marijuana since sometime in April 2007 with Andrew, but she also admitted to testing positive for marijuana on a hair follicle test on May 1, 2007. Notably, her subsequent tests on October 12, 2007 and October 31, 2007 were negative.
We do not question Chantelle's love for her children and desire to be a good mother. In fact, the record shows the efforts she made during this litigation to be a fit parent. LaDonna described Chantelle's mothering as "exemplary" during these proceedings and explained that Chantelle spent more time doing things with the children. However, the court's custody determination is not just based on the parties' actions during litigation when they are fighting for custody and have incentive to be on their best behavior. Rather, the court must consider the totality of the evidence and circumstances to determine whether the parents' exercise of custody would result in substantial harm to the children and to reach a decision that is in the children's best interests. In making these determinations, the trial court had the opportunity to observe the parties and assess their demeanor and credibility first-hand *97 over six days of trial, whereas this court is tasked with reviewing a cold record containing conflicting testimony and accounts of Andrew and Chantelle's marriage and parenting ability.
Considering all the evidence, with particular emphasis on the drug use, we cannot say that the trial court abused its discretion in finding that placing the children in the custody of Chantelle or Andrew would result in substantial harm to them. Both parties exhibit instability, immaturity, and poor judgment. Their regular use of marijuana and their occasional abuse of prescriptive medications during the marriage subjected the children to a harmful environment. Chantelle's testimony shows her unwillingness and reluctance to recognize the deleterious effects that drug use has on children and on her parenting ability. Both parties have a lax attitude toward marijuana use. The record also shows that Chantelle is not financially independent. She was not employed or financially independent at the time of trial, though she claimed to have obtained a job as a substitute teacher. Her work history recounted at trial lacked long term, stable employment. In contrast, there is no showing in the record that the Teagues, despite past bankruptcies and tax issues, are not able to provide for the children. Lastly, we find from the record that mental health issues impact Chantelle's behavior contributing to instability in her life that will likely adversely affect the children. She is in need of further therapy and treatment as indicated by Dr. Pederson.
We have also considered the factors set forth in La. C.C. art. 134 for determining a child's best interest in custody disputes. These weigh in favor of the trial court's award of custody to the Teagues. They are able to provide love, affection and spiritual guidance for the children as well as take care of their material needs. As of this time, the children will have resided with them for a significant period, so the desirability of maintaining continuity of environment for the children is an important consideration as is the permanence of the custodial home. These factors are even more important considering the great distance between Louisiana and Indiana that requires the children to be raised primarily in one location so as to minimize the upheaval in their lives from frequent travel between homes. Chantelle has not demonstrated that she is able to provide stability for her children as indicated the number of moves she has made over the years, including during the marriage, and her sketchy employment history. Oak Grove has been the children's principal home place since Andrew and Chantelle married. By this time, the children have home, school and community history that custody with the Teagues will continue. The record shows that the Teagues assisted in providing care for the children during the marriage and have done so throughout these proceedings.
For these reasons, we do not find the trial court's custody determination to be manifestly erroneous or clearly wrong. It is in the children's best interest to be in a stable home environment that can be provided by the Teagues. However, we order that the Teagues' exercise of custody demands that Andrew no longer reside with them in the same residence as the children for the reasons to be addressed in the following section.

Assignments 10 and 11:
In these two assignments of error, Chantelle complains that the trial court erred in failing to specify a plan of visitation that guarantees her frequent and continuous contact with her children. She also argues that the trial court's judgment allows Andrew, an admitted habitual drug *98 user, to have free and unsupervised access to the children. We agree that the judgment fails in both respects.
A parent who is not granted custody or joint custody of a child is entitled to reasonable visitation rights unless it is determined after a hearing that it would not be in the child's best interest. La. C.C. art. 136. Chantelle was awarded visitation rights. This award means that the court found it to be in the children's best interest to have visitation with their mother. We agree. However, the trial court left the determination of any visitation schedule up to the parties. We find that the distance between the parties and the best interests of the children requires imposition of a set visitation schedule.
The record shows that the Teagues colluded with Andrew in taking the children from Indiana after Andrew had told Chantelle to leave and that they kept her from seeing the children for two weeks until there was no choice but to comply with the orders of the court. Considering their past actions in keeping Chantelle from the children, we find it necessary to set forth specified visitation of meaningful duration to maintain a close and continuing relationship between the children and their mother. We now order that Chantelle is entitled to visitation under the schedule set forth in the Order of Visitation attached as "Appendix A" to this opinion.
The judgment made no reference to visitation on the part of Andrew, and he has not appealed to request visitation rights. During the litigation, Andrew was living with his parents in the same home as the children. The judgment awarding sole custody to his parents is based on a finding that custody by Andrew would result in substantial harm to C.T. and M.T. The record clearly supports this finding.
Andrew admitted to drug use beginning in his teen years. He admitted to using marijuana, cocaine, crystal meth, ecstasy, and prescription drugs. He testified that he bought and sold marijuana during the marriage and that he even tried to grow it from a kit. The evidence clearly shows that he was the principal instigator of drug use in the marriage. He testified that he quit drugs as of June 19, 2007 to "tend to business." This refers to the custody litigation and probation he received for the second D.U.I. He has not expressed any convincing desire or willingness to quit his drug habit on a permanent basis. His parents have at the least been purposefully ignorant of the extent of his drug use. They have provided him with a paycheck even when he has failed to work and a place to live, thereby condoning his habit. For these reasons, we find that Andrew, an habitual drug user, is prohibited from residing in the same home as the Teagues and the children. He is prohibited from taking the children from the home without being accompanied by either Chris or LaDonna Teague, and he is not to be alone with the children without the direct supervision of his parents.

Assignments 11 and 12:
Chantelle asserts that the trial court failed to award her child support for M.T., her biological child with Andrew. Because Chantelle was not awarded custody, we find that this issue is moot.
She also asserts that the trial court erred in failing to award her interim spousal support. A spouse seeking interim support has the burden of proving that she lacked sufficient income or the ability to earn sufficient income to maintain the standard of living that she enjoyed during the marriage. Clark v. Clark, 34,314 (La. App.2d Cir.11/1/00), 779 So.2d 822, writ denied, XXXX-XXXX (La.1/12/01), 781 So.2d 563. While Chantelle did leave Louisiana with no income, the record does not show *99 that she lacked the ability to earn sufficient income to maintain the standard of living she had during the marriage. We find no basis for a retroactive award of interim spousal support.

CONCLUSION
For the reasons set forth above, we affirm the award of sole custody of C.T. and M.T. to the Teagues. However, the judgment is amended to specify visitation awarded to Chantelle, to order the Teagues to bar Andrew from residing in their home while they have custody of the children and to supervise any visitation exercised by Andrew with the children. An order specifying the visitation schedule is attached to this opinion.
AFFIRMED AS AMENDED.

*100 APPENDIX A