BROWN, Chief Judge.
This is an appeal by pro se litigant, Christopher Neil Chandler, from an adverse custody ruling made by the trial court on October 19, 2012. These parties have been in court frequently since 2007, operating under an interim custody ruling until the trial court’s October 2012 judgment.[1] Finding no error in the factual findings and determinations made by the trial court, we affirm the judgment of the trial court.

Procedural History

Chang Mi Mia Chandler and Christopher Neil Chandler were married on January 10, 2004. Their son, Joshua, was born on January 28, 2004, and their daughter, *415 Isabella, was born on November 4, 2005. Mrs. Chandler filed a petition for legal separation in a covenant marriage pursuant to La. R.S. 9:307 on July 25, 2007.[2] She sought an award of interim spousal support; permanent periodic spousal support; joint custody with her as domiciliary parent and Mr. Chandler with reasonable visitation; child support; use and occupancy of the family home; and an order that Mr. Chandler maintain medical, dental and vision insurance on the children and Mrs. Chandler until further orders of the court.
On August 14, 2007, Mr. Chandler filed an answer and reconventional demand for divorce, making specific allegations of fault on the part of Mrs. Chandler and seeking joint custody with him as domiciliary 12parent; reasonable visitation privileges for Mrs. Chandler; an award of child support; use and occupancy of the family home or fair rental value while Mrs. Chandler lives in the home; and the state and federal tax deductions for both children.
An interim judgment signed on October 22, 2007, provided, inter alia, for joint custody as set forth in a Joint Custody Implementation Plan;[3] and interim spousal/child support in the amount of $1,200 per month to be paid by Mr. Chandler to Mrs. Chandler. Based upon the parties’ agreement that Mr. Chandler, a licensed realtor, would list and sell the family home, Mrs. Chandler gave up her right to use/occupancy of the home and on November 2, 2007, a judgment awarding Mr. Chandler use of the home was signed. This judgment specified that Mr. Chandler was to pay the mortgage, insurance, taxes, and other expenses on the family home until it was sold.
On June 20, 2008, Mrs. Chandler filed the first of three petitions (the others were filed on August 26, 2009, and on April 28, 2011) for issuance of a rule for contempt for past due child support and failure to provide insurance for the children.[4] On July 21, 2009, Mr. Chandler filed a petition for divorce from the parties’ covenant marriage pursuant to La. R.S. 9:307(A)(5). Mrs. Chandler filed an answer on August 6, 2009, admitting all allegations in Mr. Chandler’s petition except for the one stating that all custody and support issues had been determined. The parties were divorced via judgment signed on August 28, 2009.
| ¡¡On November 13, 2009, Mrs. Chandler filed a motion to reset all pending rules. In her motion, Mrs. Chandler asserted that the parties’ custody arrangement under the JCIP was not working because of Mr. Chandler’s unwillingness or inability to abide by its terms and she sought a final judgment of custody with her named as domiciliary parent and Mr. Chandler with specified visitation rights. She also sought the right to re-enter the former matrimonial domicile, alleging that two years after the parties’ agreement that Mr. Chandler would list and sell the home, he had not done so, nor had he paid the mortgage during that time, in spite of the fact that she gave up her right to exclusive use of the parties’ home for that specific purpose. On December 16, 2010, a judgment was signed appointing John Simo-neaux to perform a mental health evaluation of the parties; continuing the custody *416 arrangement as set forth in the JCIP/in-terim judgment of October 22, 2007; ordering Mr. Chandler to pay Mrs. Chandler child support in the amount of $125 per week (a modification of the support amount set forth in the previous judgment but subject to the retroactivity provision set forth in the original judgment). Mr. Chandler’s attorney’s motion to withdraw, which was filed on September 13, 2011, was granted by the trial court on November 15, 2011.
A hearing on the issue of Mr. Chandler’s child support arrearages was held and on October 19, 2012, the parties entered into a consent judgment dismissing all pending contempt matters (there have been three more petitions seeking child support ar-rearages since the consent judgment) and deeming Mr. Chandler’s spousal and child support obligations satisfied as of |4that date. This judgment also dismissed Mrs. Chandler’s claim for permanent spousal support.
The custody hearing was also held and, following two days of trial, the court signed a judgment on October 19, 2012, granting the parties joint custody of the children, naming Mrs. Chandler as domiciliary parent, and awarding physical custody of the children to Mr. Chandler every other weekend and two hours every Tuesday evening.[5] The judgment also set forth a specific custody schedule for holidays and summers. Mr. Chandler was ordered to pay Mrs. Chandler child support in the amount of $752.21 per month effective October 1, 2012. He was also ordered to continue to see his psychiatrist and take his medication and to provide on an annual basis documentation from his treating psychiatrist that he has kept his appointments and taken his medication. Mrs. Chandler was ordered to provide Mr. Chandler with documentation stating that she was no longer required to take medication.[6]
Mr. Chandler has appealed from the October 19, 2012, judgment, urging error in the trial court’s failure to continue the custodial arrangement | fithe parties had enjoyed for five years under an interim consent judgment of equal, shared physical custody of the children.[7]

Discussion

The parties in this case consented to the interim judgment rendered by the court on October 22, 2007. They were awarded joint custody and shared physical custody in alternating seven-day periods with a midweek exchange of the children for approximately five years.
*417 In Lawson v. Lawson, 48,296 (La.App.2d Cir.07/24/13), 121 So.3d 769, 772-773, this court noted that:
In this case, although the 2010 judgment was designated an “interim judgment,” it was a final judgment as to every issue except the choice of school for the child. The 2009 hearing transcript indicates the parties agreed to it; thus, it would be considered a consent judgment and is final until one of the parents sought a modification or they both agreed to a change. Amanda’s contention that the trial court erred in allowing the 2010 judgment to remain in effect is misplaced. The trial court concluded that Berley failed to meet his burden of proof to modify the judgment that was in effect, i.e., the 2010 judgment. Amanda does not argue that the trial court’s substantive finding on that issue was incorrect. Although the 2010 judgment may have been titled “interim,” the record reflects that the parties had reached an agreement as to its terms in court in 2009, and they happily abided by that agreement for basically three years. Thus, when Berley failed to meet his burden of proof (again, finding Amanda does not dispute), the trial court correctly left the 2010 judgment in effect.
As in the Lawson case, the interim judgment in this case was a final judgment as to every issue concerning custody and the parties agreed to its | fiterms which were specifically set forth in a Joint Custody Implementation Plan. It was, in fact, a consent judgment under which the parties operated for five years. To alter the custody arrangement set forth in this initial consent decree, Mrs. Chandler, as the parent who filed seeking a final custody determination, had the burden of showing that there had been a material change in circumstances since the interim decree was entered and that her proposed modification, naming her as domiciliary parent with primary physical custody of the children during the months that they were in school, was in the children’s best interest. Evans v. Lungrin, 97-0541, 97-0577 (La.02/06/98), 708 So.2d 731; Lawson v. Lawson, supra.
The primary consideration in any child custody determination is the best interest of the child. La. C.C. art. 131; Atkins v. Atkins, 47,563 (La.App.2d Cir.09/26/12), 106 So.3d 614. The court must consider all relevant factors in determining the best interest of the child. La. C.C. art. 134; Atkins, supra. Every child custody case should be decided in light of its own particular set of facts, circumstances and relationships. Atkins, supra; Shivers v. Shivers, 44,596 (La.App.2d Cir.07/01/09), 16 So.3d 500.
A literal articulation of the article 134 factors is not necessary when a trial court reaches a conclusion regarding the best interest of the children. Atkins, supra; Walker v. Walker, 38,982 (La.App.2d Cir.08/18/04), 880 So.2d 956. Furthermore, while helpful, the trial court’s means of weighing and balancing the article 134 factors need not be specifically stated. Atkins, supra.
La. R.S. 9:335(A)(2)(b) provides that, to the extent feasible and in the best interest of the child, physical custody should be shared equally. Yet when the trial court finds that a decree of joint custody is in the best interest of the child, the statute does not necessarily require an equal sharing of physical custody. Chandler v. Chandler, 45,308 (La.App.2d Cir.05/19/10), 37 So.3d 569; Semmes v. Semmes, 45,006 (La.App.2d Cir.12/16/09), 27 So.3d 1024. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. Id.
*418 Courts have inherent power to determine a child’s best interest and to tailor a custody order that minimizes the risk of harm to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Lawson, supra. The trial court has vast discretion in deciding matters of child custody and visitation. Chandler, supra; Slaughter v. Slaughter, 44,056 (La.App.2d Cir.12/30/08), 1 So.3d 788. This discretion is based on the trial court’s opportunity to better evaluate the credibility of the witnesses. Id. The trial court’s findings in child custody matters will not be disturbed on review without a showing of clear abuse. Bergeron, supra; Lawson, supra.
According to Mr. Chandler, the trial judge inappropriately limited him in the presentation of his case when, based upon the judge’s announcement at the beginning of the trial that he did not care how many friends or family members the parties brought to testify about their parenting abilities, the parties agreed not to call any character witnesses. Because of the court-appointed expert’s recommendation that 50/50 physical custody be maintained, and the fact that the evidence showed that for five years the | ^custodial arrangement had been in the children’s best interest, Mr. Chandler had no problem dismissing his witnesses. Instead, the trial judge focused on the “biased” testimony of Mr. Chandler’s first ex-wife who “obviously had an ax to grind from previous life circumstances” and inappropriately allowed his opinion of Mr. Chandler, who chose to represent himself and therefore offended the trial court by appearing in his courtroom without an attorney, to taint his view of the evidence and to modify custody contrary to the expert recommendation of the court-appointed expert, Dr. John Simo-neaux.
We construe Mr. Chandler’s assertions about the trial judge’s opening remarks and alleged bias against him as allegations that he did not receive a fair trial. These two issues were also raised by Mr. Chandler in the previous appeal heard by this court in Chandler, 37 So.3d 569, 575. In that case, this court found that the record failed to support Mr. Chandler’s contentions regarding the trial judge’s opening comments and noted that his complaints about the judge’s “bias” against him in that case were simply credibility determinations that unfortunately were not resolved in his favor.
We have reviewed the instant record and find no evidence whatsoever that the trial court limited either party in presenting evidence or calling witnesses. In fact, the record shows just the opposite. There were no limiting remarks by the trial judge, either at the beginning or at any other point in the trial. At the end of Mrs. Chandler’s testimony after her attorney submitted his client’s case, the trial judge gave Mr. Chandler a chance to call witnesses. Specifically, the judge stated, “Call your witness. Who are you going to call?” Mr. Chandler’s response was, “No further witnesses, your honor.” Furthermore, there is absolutely no evidence that the trial kludge discriminated against Mr. Chandler as a pro se litigant. The trial judge gave extreme latitude to Mr. Chandler on matters of legal procedure during the hearing in this matter. A comment by the judge about Mr. Chandler being his “own worst enemy” was made directly after Mr. Chandler’s questioning of Mrs. Chandler and was made in conjunction with the judge’s observation that Mr. Chandler came across as controlling, manipulative and hard to deal with as he conversed with Mrs. Chandler — which incidentally gave the court a good representation of how the parties’ interactions typically went.
*419 Addressing Mr. Chandler’s argument that the trial court erred in rejecting the recommendation of Dr. Simoneaux to continue the 50/50 physical custody arrangement and in significantly reducing his time with the children, we note that the trial judge referred to the psychologist’s report throughout the hearing and again during his oral reasons for judgment. The court accepted many of the recommendations and observations made by Dr. Simoneaux, yet when it came to the final determination of custody, the judge stated that it had more information before him to consider, in addition to the psychologist’s report, such as evidence of Mr. Chandler’s lack of financial responsibility and other instances of irresponsibility and bad judgment, together with problems of credibility and several negative personality traits the judge observed which affected Mr. Chandler’s ability and/or willingness to cooperate with Mrs. Chandler in the day-to-day care and raising of the children.[8]
|inIn his report, Dr. Simoneaux observed:
Of course, I have concerns about Chris being less than responsible with regard to child support. If there is evidence that he is not able to pay child support, then this needs to be addressed by the court very firmly. Chris claims that he is very successful with his business. He has so many activities going, that if he cannot pay child support because he is simply not making enough money, then he needs to spend more time directed in this activit[y]. He boasts about his degree of community involvement, and also boasts about his business acumen. I would hope that he could prioritize his children’s financial needs over his commitment to the community. His children should come first. He says his children are a high priority in his life, then he needs to demonstrate that financially. ... If he is not willing to [honor his child support obligations faithfully], or that he holds back on his work voluntarily in order to prevent having to pay child support, then I would suggest that the court deals very forcefully with this. Chris needs to spend that money on his children rather than his girlfriend. Sometimes, he clearly gets his priorities] distorted.
At the custody hearing, held 16 months after Dr. Simoneaux’s evaluation and report, the testimony in this case established that:
*Mr. Chandler was voluntarily underemployed since the parties’ separation and divorce, having reported income of $66,653 in 2007, the year that the parties separated; $21,983 in 2008; $7,810 in 2009; $6,000 in 2010; and $15,600 in 2011.
*Mr. Chandler lived in a small, one-bedroom apartment, for which he paid approximately $1,000 per month; he moved into this apartment after he allowed the marital home to go into foreclosure, having induced Mrs. Chandler to vacate the home and let him live there so he could get the house ready to sell.
*Instead, Mr. Chandler lived in the home for 18 months without ever paying the mortgage note before the bank seized the home and the equity was seized to satisfy a pre-existing child support obligation owed by Mr. Chandler.
*Mr. Chandler filed for bankruptcy and a marital retirement account was seized, also to satisfy child support arrearages. He also allowed mandated health insurance coverage on the children to lapse *420 and they were relegated to Medicaid coverage.
*Mr. Chandler did not take his medication for bipolar disorder as prescribed, which sometimes resulted in unpredictable and irrational behavior.
|,/"There were several occasions on which Mr. Chandler left the two young children unattended or unsupervised.
*Mr. Chandler had his girlfriend and her child, who lived in Texas, spend the night at his one-bedroom apartment when his children were there, and saw nothing wrong with that arrangement, contending that it was good for his kids to see an example of a loving relationship.
*Mr. Chandler was not cooperative with his ex-wife when it came to school and homework assignments for the children; many times that the children were with him, their assignments were not completed or turned in, and he did not keep them current on their reading assignments or studying/preparation for tests.
*Mr. Chandler was not appropriately concerned about the children’s medical and dental needs on a consistent basis as evidenced by his inability or refusal to replace his son’s broken/lost glasses for several months and his failure to keep them covered by medical insurance.
In decreasing the amount ot time physical custody that Mr. Chandler would have, the court stressed that it did not find him to be a bad parent or one who did not love his children. Instead, stressing that the overriding consideration in this case was the best interest of the children, the court determined that the alternating seven-day periods, with midweek exchanges, were no longer working, in light of the above concerns and the fact that the children were now school-age. See, Gaydon v. Gaydon, 45,446 (La.App.2d Cir.05/12/10), 36 So.3d 449; Semmes, supra. The court concluded that Mrs. Chandler could better provide the stability that the two children need during the school year. While the trial judge was not required to do a formal analysis of the factors set forth in La. C.C. art. 134 or to give equal weight to the factors, see, Corral v. Corral, 47,294 (La.App.2d Cir.06/13/12), 93 So.3d 793, we note that the evidence shows that the parties were equal as to factors (1), (2) and (12); factors (4) and (11) favored Mr. Chandler; and factors (3), (5), (6), (7), (8) and (10) weighed in favor of Mrs. Chandler. Factor (9) did not come into play in this case.[9]
We find that the record in this case supports the conclusion that Mrs. Chandler established that a material *421 change in circumstances had occurred since the 2007 interim consent decree in that 50/50 shared custody was no longer working because the children were school-age and based upon Mr. Chandler’s demonstrated inability to cooperate in the equal co-parenting of the children with Mrs. Chandler. We further find no error in the trial court’s determination that the best interest of the children would be met by naming Mrs. Chandler as domiciliary parent with primary custody of the children during the time they were in school and giving Mr. Chandler physical custody of the children every other weekend and 5:00-7:00 p.m. every Tuesday and on holidays and during the summer as specified in the trial court’s judgment.

Conclusion

For the reasons set forth above, the judgment of the trial court is AFFIRMED.
CARAWAY, J., concurs with written reasons.

. Most of the parties' appearances in court have been related to Mr. Chandler’s nonpayment of child support. Mr. Chandler and his first wife, Elizabeth Toups Chandler (now Harrel), also had child support and custody disputes which required court resolution. See, Chandler v. Chandler, 45,308 (La.App.2d Cir.05/19/10), 37 So.3d 569.

. On August 18, 2007, Mrs. Chandler filed an amending petition seeking an article 102 divorce, alleging that the parties had not obtained the counseling required by La. R.S. 9:307(B).

. Apparently the JCIP provided for equal shared physical custody of the children; the JCIP is not in the record.

. Mrs. Chandler also sought an award of attorney fees related to the collection of past due child support.

. While the parties and the trial court have used the term "visitation” to refer to the Mr. Chandler’s custodial time with the children, we note that "visitation" as provided for in La. C.C. art. 136 applies only when a parent is not awarded custody or joint custody. The time that parents with joint legal custody such as Mr. and Mrs. Chandler share with their children is more accurately described as physical custody allocation pursuant to a joint custody plan. La. R.S. 9:335; Evans v. Lungrin, 97-0541, 97-0577 (La.02/06/98), 708 So.2d 731; Lunney v. Lunney, 11-1891 (La.App. 1st Cir.02/10/12), 91 So.3d 350, writ denied, 12-0610 (La.04/04/12), 85 So.3d 130.

. Both parties have a diagnosis of bipolar disorder.

. There was an issue regarding the timeliness of Mr. Chandler’s appeal which was resolved when this court, in a writ grant on July 11, 2013, reversed a ruling by the trial court which had granted a motion filed by Mrs. Chandler regarding the appeal’s timeliness and remanded the matter to the trial court for perfection of a devolutive appeal. Between the October 19, 2012, judgment and the writ grant, Mrs. Chandler has filed three more petitions in rule for contempt for past due child support and attorney fees. In a judgment signed on March 20, 2013, Mr. Chandler was found to be in contempt and a schedule for the payment of the arrearages was established. The record shows that partial payments have been made.

. Dr. Simoneaux described this as a "self-absorbed, grandiose, ego-inflation” which tends to distort his judgment and perception of "reality.”

. Article 134 provides that the court shall consider all relevant factors in determining the best interest of the child. Such factors may include: (1) The love, affection, and other emotional ties between each party and the child. (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child. (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. (5) The permanence, as a family unit, of the existing or proposed custodial home or homes. (6) The moral fitness of each party, insofar as it affects the welfare of the child. (7) The mental and physical health of each party. (8) The home, school, and community history of the child. (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. (11) The distance ■ between the respective residences of the parties. (12) The responsibility for the care and rearing of the child previously exercised by each party.