LOLLEY, J.
Lin this child custody proceeding, Molly Creech Manno appeals a judgment of the First Judicial District Court, Parish of Caddo, State of Louisiana, awarding her and her former spouse, Mark Kenneth Manno, joint custody of their minor child and designating her as the domiciliary parent. More specifically, Molly appeals the trial court’s decision to exclude evidence, including allegations of sexual abuse which allegedly occurred before the parties entered into a consent judgment on November 27, 2007. For the following reasons, we affirm the trial court’s judgment.
Facts
Mark Kenneth Manno and Molly Creech Manno were married on May 13, 2000, in Shreveport, Louisiana. One child was born of the marriage, A.W.M., a son, born on November 22, 2002. Litigation between Mark and Molly began on August 9, 2006, when Molly sought a protective order with the Caddo Parish Juvenile Court alleging that Mark sexually abused A.W.M., who was three years old at the time. A protective order was issued against Mark based solely on the allegations, and Dr. John Simoneaux, a forensic psychologist, was appointed by the court to conduct mental health and custody evaluations of all parties involved. The court also appointed an attorney for the child pursuant to La. R.S. 9:345. However, despite the allegations against Mark, Molly filed a motion to dissolve the protective order on January 18, 2007, and a contradictory hearing was held wherein Molly was questioned by the juvenile court regarding the alleged sexual abuse of A.W.M. Based upon that questioning, the juvenile court dismissed the proceedings against Mark, found the |2dismissal to be free, voluntary, and without coercion, and deferred all future issues to the First Judicial District Court, where Mark had initiated divorce proceedings against Molly.
Incidental to divorce, Mark and Molly appeared before the trial court on November 27, 2007, and on that date entered into *658 a consent judgment granting joint custody of A.W.M. to both parties, with Molly being named the domiciliary parent (the “consent judgment”). Mark was awarded visitation, and both parties, along with their attorneys and the child’s attorney, signed an eight-page joint custody implementation plan (“JCIP”) setting forth the particulars of visitation and each party’s obligations moving forward.
Custody was exercised pursuant to the consent judgment and JCIP until January 13, 2011, when Molly filed an ex parte motion for supervised visitation requesting that Mark’s visitation be limited to supervised visitation only. Acting on the advice of her attorney, Molly took A.W.M. to Utah to see Dr. David Corwin, a psychologist who specializes in child sex abuse. Following an interview and examination of A.W.M., Dr. Corwin issued a report stating that in his professional opinion, A.W.M. was experiencing psychological and emotional trauma. Relying on this report, Molly filed the motion for supervised visitation asserting that A.W.M.’s psychological and emotional trauma stems from Mark sexually abusing A.W.M.
In response to Molly’s motion,- Mark filed exceptions of res judicata, no cause of action, and/or failure to state a material change of 1 ¡¡circumstances. Mark also requested that the court reappoint Dr. Simo-neaux, and that both parties reconvene to again determine custody of A.W.M. Because of Molly’s objection to the reappointment of Dr. Simoneaux, a hearing was held, wherein the trial court maintained the appointment of Dr. Simoneaux and requested that he compile a second report to advise the court regarding any issues that affect the custody and best interest of A.W.M. The trial court denied Molly’s request for supervised visitation and deferred Mark’s exceptions to trial on the merits. Additionally, the trial court informed the parties that the heightened Bergeron standard would not apply, and noted that either party must show a material change in circumstances after the consent judgment; therefore, evidence prior to November 27, 2007, would not be admissible absent a compelling reason demonstrated at trial.
In accordance with the trial court’s order, the parties and A.W.M. were reevaluated by Dr. Simoneaux, and a trial date was scheduled. When the parties appeared in court for trial, Molly made clear that she intended to offer evidence regarding certain incidents which allegedly occurred prior to November 27, 2007. Further, Molly made the assertion that she had been coerced into dismissing the abuse charges against Mark and signing the consent judgment. After hearing Molly’s arguments, the trial court reaffirmed its previous position that evidence prior to the consent judgment would not be admissible, and stayed the proceedings to allow Molly to apply for a supervisory writ, which this court denied due to Molly having an adequate remedy on appeal.
|4The matter was eventually set for trial on February 18, 2014. However, while the matter was pending, Molly filed an amended motion for supervised visitation, alleging that Mark sent lewd, inappropriate photos to A.W.M.’s cell phone. An emergency hearing was held wherein Mark admitted to taking the photos, but stated that he meant to share them with a woman he was dating at the time. Mark explained to the trial court that A.W.M. had a deactivated cell phone but had access to Mark’s iTunes account, which included access to “Photoshare” where the photos were stored. Although he immediately deleted the photos after he took them, Mark claimed that they were inadvertently transferred to AW.M.’s cell phone via the “Photoshare” application. Nevertheless, *659 the trial court agreed with Molly and restricted Mark to supervised visitation until trial.
Trial was held over a three-day period. At the onset, the trial court had the parties clarify the remedies sought regarding a modification of custody. Molly requested sole custody of A.W.M. as well as relief under the Post-Separation Family Violence Relief Act, which requires supervised visitation. On his cross rule for a change in custody, Mark sought joint custody with himself being named the domiciliary parent.
Almost immediately, it became apparent that much of Molly’s argument at trial was going to be centered around the sexual abuse allegations which allegedly occurred prior to November 27, 2007. As a result and before proceeding any further, the trial court once again reminded the parties that it was going to exclude any evidence of events prior to that date.
|fiMolly’s testimony was broken up over the three days of trial due to the availability of certain experts and witnesses. Molly first testified to the problems involving A.W.M. and visitation with Mark shortly after the parties entered the consent judgment. Molly explained that A.W.M.’s stuttering problem became considerably worse after November 27, 2007, and that his stuttering seemed to correlate with visitations with his father. Molly also testified that around this time, A.W.M. was very hesitant about visiting Mark, and would often cry and call home asking her to come and get him. Molly stated that it was a common occurrence for A.W.M. not to spend the entire visitation period with Mark due to A.W.M. becoming upset and .wanting to return home. However, she noted that these situations have improved as A.W.M. has grown older.
Mark was also questioned about his relationship with A.W.M. following November 27, 2007. Mark explained that it was very “rocky” during the first few years, and he experienced quite a few problems with A.W.M. wanting to spend the entire visitation period with him. He testified that sometimes A.W.M. would stay the whole weekend, sometimes he would stay one night, or sometimes he would not stay either night. However, Mark stated that these issues began to subside after a meeting in 2008, when he, A.W.M., and Molly went to see Dr. Bruce McCormick, who recommended Mark be more forceful with A.W.M. As to A.W.M.’s stuttering, Mark noted that A.W.M. did have a stuttering problem, but the overall trend was that it had significantly improved over the years. He also [ ^stated that because he stuttered as a child, he was not extremely concerned about it.
Mark further testified that beginning in 2009, he and A.W.M. started to take out-of-town trips together during the summer months, including trips to Disney World, Washington, D.C., Pennsylvania, New Orleans, Dallas, and the Grand Canyon. They also made smaller trips like football games and camping. Mark stated that at no time during those trips, or recently, was there a problem with A.W.M., and. that they enjoy spending time with each other.
Barbara Manno, Mark’s mother, testified that she was present -with her son and A.W.M. on two of the out-of-town trips, and that during those trips A.W.M. and Mark got along great.
Dr. Robert Critcher, a speech and language pathologist, testified that he examined A.W.M. beginning in August of 2009, for the purpose of determining whether he was suffering from a stuttering disorder. Dr. Critcher stated that upon examination, he diagnosed A.W.M. with a moderate to severe stuttering problem. Dr. Critcher *660 then stated that Molly asked him to observe A.W.M.’s stuttering problems prior to interacting with Mark and then contrast that with his speech following the visit, Dr. Critcher testified that after witnessing several visits, A.W.M. stuttered more after seeing his father than before, but on the last visit, A.W.M.’s stuttering was actually better following his visit with Mark. Molly’s father, John Creech, testified that shortly after the parties entered into the consent judgment, A.W.M. was standoffish and seemed rather stressed. He also 17stated that A.W.M. had a tendency to stutter and the stuttering seemed to be more prevalent before and after visits with Mark. However, Creech noted that A.W.M.’s stuttering has improved over time.
Sister Cristina Angelini, a teacher at the E. Renzi School in Shreveport where A.W.M. attended preschool, was called to testify about an occasion which occurred in December 2007. She testified to observing A.W.M. screaming, crying and pulling away from Mark when he came to pick up A.W.M. from school. Although she remembered the screaming and crying, Sister Angelini stated that Mark did nothing inappropriate. She also stated that before the protective order was in place in 2006, both Mark and Molly were involved in A.W.M.’s life.
Molly then testified as to the lewd photo that was found on A.W.M.’s cell phone. Molly explained that she and A.W.M. were going through A.W.M.’s cell phone together and found the lewd photo and another inappropriate photo of a man standing on top of a bar. Molly stated that she never contacted Mark to discuss the inappropriate photos, but did admit that she had no evidence that these photos were sent to A.W.M.’s cell phone intentionally.
Mark admitted to taking the photos, but did not know A.W.M. viewed them until he was served with Molly’s motion for supervised visitation. Mark stated that he meant to share the lewd photos with his girlfriend at the time, which was confirmed through this woman’s later testimony, Mark also stated that although he immediately deleted the photos after he took them, they were automatically sent to A.W.M.’s cell phone via the “cloud” Ubeeause A.W.M. had access to his iTunes account for games and downloading music. Mark conceded that it was very poor judgment on his part to take the photos in the first place, but testified that he never meant them to be viewed by A.W.M.
Barbara Thorne-Thomsen was accepted as an expert in professional counseling and testified that, she began to see A.W.M. in 2008 for “play therapy,” and she has seen him approximately 48 times since. She informed the court that she and A.W.M. have a good relationship and that A.W.M. is very open during their counseling sessions. She testified that AW.M.’s relationship with Mark was very poor at the beginning, but has improved over time.
Thorne-Thomsen was then asked about the alleged abuse and whether A.W.M. reported any incidents to her while in counseling sessions. Because her testimony described events occurring prior to November 27, 2007, the trial court limited her testimony to after that date. Thorne-Thomsen also noted that A.W.M. reported abuse to her in 2010 at a meeting in which Molly’s counsel was present. Ultimately, it was clarified on cross examination that the child had only claimed that Mark “did stuff’ to him when he was young, and it was only at this meeting with Molly’s counsel that A.W.M. went into detail about the alleged sexual abuse.
Jennifer Flippo, a forensic interviewer at Gingerbread House testified that she interviewed A.W.M. in 2006, 2007, and 2011, all in relation to the sex abuse allega *661 tions against Mark. Flippo stated that she turned over her findings to law enforcement, but was not aware if Mark was ever | nprosecuted. Flippo’s testimony was limited in scope due to the trial court informing her that she could not describe anything that occurred prior to November 27, 2007, but she did note that it did not appear that A.W.M. was coached in any way.
Detective John Flores, a sex crimes investigator with the Shreveport Police Department, testified that he was assigned to investigate the allegations against Mark. He stated that pursuant to his investigation, he sent A.W.M. to Gingerbread House to be interviewed. Detective Flores noted that although he was not present in the room with A.W.M.' and Flip-po during their interview, he listened from an adjacent room. Detective Flores then explained that at the conclusion of his investigation he turned over the file to the district attorney’s office, but that Mark was not prosecuted.
Detective Flores was also questioned about the lewd photo that appeared on A.W.M.’s cell phone. Detective Flores testified that his understanding of the situation was that the photo was not sent to A.W.M. purposefully, but was in the “cloud” and accessible from A.W.M.’s cell phone. Detective Flores stated that the photo and information provided to him was sent to the district attorney’s office, but no charges were brought.
Molly’s expert, Dr. David Corwin, was accepted as an expert in child psychology, psychiatry, and forensic psychiatry, and testified that he saw A.W.M. in April 2010, when Molly brought him to Utah for an assessment. Dr. Corwin informed the court that he conducted interviews of both Molly and A.W.M., and prepared a written report detailing his findings. However, this report was rejected by the trial court because a majority of Dr. Corwin’s | ^opinions were based on evidence of events occurring prior to November 27, 2007.
Dr. Corwin opined it was impossible to determine the child’s best interest relative to contact with Mark without taking into consideration all of A.W.M.’s history, including the events prior to November 27, 2007. Dr. Corwin could not testify as to custody arrangements in this matter as he did not conduct a custody evaluation or meet with Mark.
Dr. Bruce McCormick testified that he began to see A.W.M. in 2006, and he treated the child until 2008. Dr. McCormick informed the court that his initial goal was to assist the parties as they began to exercise custody pursuant to the consent judgment and JCIP. He also helped the parties make custody exchanges and gave recommendations to them in helping A.W.M. cope with the separation.
Despite the photo found on A.W.M.’s cell phone and the allegations of abuse against Mark, Dr. McCormick stated that he has never feared for the child’s safety and well-being while with Mark. When asked why he stopped seeing A.W.M., Dr. McCormick explained that Molly developed an accusatory tone toward him, and he believed that she grew angry with him because he would not validate the abuse allegations.
Dr. Webb Sentell, a medical neuropsy-chologist, testified that he examined Molly at the request of Dr. McCormick to determine whether Molly was delusional or suffering from a delusional disorder. Dr. Sentell concluded that she was not delusional or psychiatric in any way, but was extremely stressed and tired.
In As the trial court’s expert, Dr. Simo-neaux was present throughout the entire *662 trial. He presented testimony based on his recommendation, which was shared or equal custody with Molly remaining the domiciliary parent. Dr. Simoneaux stated that many of the La. C.C. art. 134 factors weighed in favor of Molly. He noted that Molly has been the primary caregiver throughout most of A.W.M.’s life and has provided a reasonably stable and satisfactory environment. Additionally, Molly has been stable in.her own job and her own living situation and has made generally appropriate medical and educational decisions while caring for A.W.M.
In regards to Mark and A.W.M.’s relationship, Dr. Simoneaux stated that their relationship has improved over the years, and over time, it was clear that they had a “budding” father/son relationship. Dr. Si-moneaux testified that if it were not for this conflict, they would appear to have a normal father/son relationship with typical activities.
The trial court questioned Dr. Simo-neaux regarding his recommendation of shared custody. Dr. Simoneaux noted research that the child’s best interest is served when he has access to both parents, and this is true even when one of the parents has problems. When asked about the possible sexual abuse allegations, Dr. Simoneaux testified that it seemed very clear that Molly had put ideas into A.W.M.’s head and that Molly was absolutely insistent in these allegations being the truth. He explained that he was very concerned how Molly asked the questions to A.W.M. in such a leading and influential manner. Notably, Dr. Simoneaux stated that he believed, with certainty, that A.W.M.’s reports of anything that took place [i2between him and his father have been distorted and confounded by the way Molly and her mother have spoken to the child, and he believed early on that A.W.M.’s testimony was tainted.
A.W.M. testified in chambers. At the time, he was 11 years old. A.W.M. stated that- he was scared of Mark when he was little because Mark “did stuff’ to him. When asked if he knew why he was coming to court, A.W.M. responded it was because of things that happened to him when he was little. A.W.M. also testified that he loved both of his parents and enjoyed spending time with them. A.W.M. further stated that he was not afraid of either parent. Following its discussion with A.W.M., the trial court found the child to be very bright, but because the child obviously knew why he was coming to court, it thought A.W.M. seemed “programmed.”
At the conclusion of all of the testimony and prior to rendering a decision, the trial court expressed again reasons for excluding evidence of the sexual abuse allegations, reiterating that prior to the parties entering into a consent judgment, there were allegations of sexual abuse against Mark. It noted that there was a protective order filed, and an investigation took place, resulting in no charges against Mark. Moreover, the trial court stressed the fact that at the time the parties entered into the consent judgment, both Mark and Molly were represented by two well-respected and competent attorneys, and both parties knowingly entered into a consent decree awarding joint custody, with Molly being named the domiciliary parent. Therefore, the trial court explained its refusal to revisit the sexual abuse allegations that allegedly occurred before the parties entered into the consent judgment.
| iaIn the end, the trial court awarded the parties joint custody of A.W.M. Molly was named domiciliary parent, and Mark was awarded unsupervised visitation every other weekend from Friday afternoon to Sunday afternoon, with every other Wednes *663 day evening. During the summer, the court ordered alternating weeks, with a two-week block for each parent’s vacation time. As a result of the inappropriate photos found on A.W.M.’s cell phone, the trial court required Mark to undergo evaluation by a psychologist and to follow any treatment recommendations. It is from this judgment that Molly appeals. Mark answered the appeal, requesting an award of equal or shared custody instead of joint custody.
Discussion
On appeal, Molly contends that the trial court abused its discretion in excluding evidence of events which allegedly occurred prior to the consent judgment. In particular, she argues now that the child is several years older and has continued to exhibit additional emotional and behavioral evidence of trauma and abuse, all of A.W.M.’s fears, problematic behaviors, stuttering, and emotional problems can be understood by only including the child’s entire history, which includes the history of sexual which allegedly occurred prior to November 27, 2007. We disagree.
It is well settled that the paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, 1997-0541 (La.02/06/98), 708 So.2d 731. In cases where the original custody decree is a stipulated judgment and the rule of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), is inapplicable, the party 114seeking modification must prove: (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. Evans, supra; Hobbs v. Hobbs, 42,353 (La.App.2d Cir.08/15/07), 962 So.2d 1148.
In determining the best interest of the child, the court must consider all relevant factors. La. C.C. art. 134; Walker v. Walker, 38,982 (La.App.2d Cir.08/18/04), 880 So.2d 956. Each case must be determined on the basis of particular facts and circumstances by weighing and balancing those factors favoring and opposing custody for the respective parents. Walker, supra. However, the trial court is not required to provide a literal articulation of each of the factors of La. C.C. art. 134 in reaching its conclusion regarding the best interest of the children, nor is the trial court required to specifically explain its weighing and balancing of the article 134 factors. Chandler v. Chandler, 48,891 (La.App.2d Cir.12/13/13), 132 So.3d 413.
It is also well settled that courts have inherent power to determine a child’s best interest and to tailor a custody order that minimizes the risk of harm to the child. Bergeron, supra; Chandler, supra. The trial court has vast discretion in deciding matters of child custody and visitation. Chandler, supra. This discretion is based on the trial court’s opportunity to-better evaluate the credibility of the witnesses. Id. Thus, the trial court’s findings in child custody matters will not be disturbed on review absent a clear showing of an abuse of discretion. Id.
[^Further, whether evidence is relevant or not is also within the discretion of the trial court. Crowson v. Crowson, 32,314 (La.App.2d Cir.09/22/99), 742 So.2d 107. Evidence of incidents prior to the entry of a stipulated judgment may not be relevant to prove a change in circumstances but may nevertheless remain relevant on the issue of best interest of the child. Id. The trial court should not exclude evidence in a custody modification proceeding if that evidence is relevant and material to an issue which the parties have *664 not previously had a full and fair opportunity to litigate. Id.
Here, because the original custody decree was a stipulated or consent judgment, the trial court held that in order to modify the prior custody arrangement, either party must show a material change in circumstances after the consent judgment, and therefore, evidence prior to November 27, 2007, would not be admissible absent a compelling reason at trial. After a complete and thorough review of the record, we find no abuse of discretion in this decision.
As pointed out by the trial court before, during, and even after trial, the parties, together with counsel, appeared on November 27, 2007, and entered into a consent judgment granting joint custody of A.W.M. to both parties. Molly was named as the domiciliary parent and Mark was awarded unsupervised visitation. This voluntary decision by Mark and Molly to enter into a joint custody arrangement occurred shortly after Molly dismissed sexual abuse charges against Mark in juvenile court. It is clear | lfithat at that time all of the facts and allegations of abuse were known to each party as well as each party’s attorney. In fact, as pointed out by the trial court, an investigation took place, interviews were conducted, but no charges were ever bought against Mark.
Now, approximately seven years after the parties entered into the consent judgment, Molly is attempting to revisit the sexual abuse allegations that she previously dismissed against Mark. Despite having a full and fair opportunity to litigate and pursue sexual abuse charges against Mark in 2006, Molly, through her attorney, continuously attempted to pry testimony out of witnesses about events which allegedly occurred prior to November 27, 2007. However, it was obvious that there were no new sexual abuse allegations, and this became even more apparent after the trial court limited the scope of each witnesses’s testimony to events occurring after November 27, 2007.
Other than A.W.M. saying that Mark “did stuff’ to him when he was little, evidence adduced from trial reveals that he is quite comfortable with his father now, and has been for years. Mark and A.W.M. have taken numerous trips together with-' out incident, and A.W.M. specifically stated that he enjoys spending time with his father. Here, the trial court was in the best position to ascertain the evidence presented and evaluate the credibility of the witnesses. Accordingly, based on the trial court’s vast discretion, Molly’s argument that the trial court erred in excluding evidence of events which allegedly occurred prior to the parties entering into a consent judgment is without merit.
| ,7We also reject Molly’s contention that the trial court erred in excluding evidence that she was coerced into dismissing the abuse allegations against Mark as well as signing the consent judgment. A review of the record shows that on July 2, 2013, Molly, for the first time, made the assertion that she was coerced into signing the consent judgment and ultimately dismissing the abuse allegation against Mark. Molly contends that she agreed to joint custody with Mark only because she believed that based on Dr. Simoneaux’s original report performed in 2006, she would lose custody of A.W.M. if she did not stop claiming that Mark sexually abused A.W.M.
Louisiana C.C.P. art. 2004 provides that a judgment can be annulled if it was obtained by fraud or ill practice. A claim pursuant to this article must be brought within one year of discovery of the fraud or ill practice, and that period is peremptive. Smith v. Smith, 47,376 (La. *665 App.2d Cir.08/22/12), 104 So.3d 512. Duress can also be pled as an affirmative defense. La. C.C.P: art. 1005.
Here, the record is clear that Molly made no attempt to set aside the consent judgment. She also did not raise any issues regarding duress or ill practice after she filed to dissolve the protective order issued against Mark in juvenile court. As noted above, following the dismissal of the protective order, the juvenile court held a contradictory hearing wherein Molly was questioned by the juvenile court regarding the alleged sexual abuse of A.W.M. In dismissing the proceedings against Mark, the juvenile court specifically found the dismissal to be free and voluntary and without |1scoercion. Molly, together with her attorney, had ample opportunity to attack the validity of the consent judgment, and they did not do so. Accordingly, this assignment of error is equally without merit.
Mark’s Answer to- the Appeal
As a final matter, we address Mark’s answer to this appeal and his assertion that the trial court erred in awarding joint custody of A.W.M. to both parties instead of equal or shared custody as recommended by Dr. Simoneaux.
It is well settled in Louisiana that the trial court is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. Green v. K-Mart Corp., 2003-2495 (La.05/25/04), 874 So.2d 838; Smith v. Smith, 44,663 (La.App.2d Cir.08/19/09), 16 So.3d 643. A trial court may accept or reject in whole or in part the opinion expressed by an expert. Id. Further, a trial judge may substitute his/her own common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole. Id.
Here, in awarding joint custody to both parties, it is clear that the trial court relied heavily on the fact that the child had been living with his mother since the original consent judgment. Although the trial court did not adhere to Dr. Simoneaux’s recommendation of equal or shared custody, the record reveals that the trial court did in fact explore this recommendation as an option as evidenced by the repeated questioning of Dr. Simoneaux during his testimony. It is apparent that the trial court weighed all options ]19before it and made a decision based on its consideration of the evidence. Accordingly, we cannot say that the trial court abused its discretion in tailoring a custody arrangement in a manner which the trial court considered to be in the child’s best interest.
Conclusion
Having found no abuse of discretion, we affirm the trial court’s judgment awarding joint custody to Molly Creech Manno and Mark Kenneth Manno. Further, Mark’s answer to this appeal is denied. All costs of this appeal are to be shared equally by both parties.
AFFIRMED.